STATE of Wisconsin, Plaintiff-Respondent,

v.

Michael J. WHITROCK, Defendant-Appellant-Petitioner.

Supreme Court

*No. 89–1371–CR. Argued January 25, 1991.—Decided May 13, 1991.*

(Also reported in 468 N.W.2d 696.)

962

For the defendant-appellant-petitioner there were briefs and oral argument by *Glenn L. Cushing,* assistant state public defender.

For the plaintiff-respondent the cause was argued by *Marguerite M. Moeller,* assistant attorney general, with whom on the briefs was *Donald J. Hanaway,* attorney general.

CALLOW, WILLIAM G., J. This is a review of a decision of the court of appeals, *State v. Whitrock,* 153 Wis. 2d 707, 452 N.W.2d 156 (Ct. App. 1989), which affirmed a judgment of conviction entered by the circuit court for Eau Claire county, Judge William D. O'Brien.

The defendant-appellant-petitioner Michael J. Whitrock appeals his conviction on one count of burglary, contrary to sec. 943.10(1)(a), Stats., which was entered based on his guilty plea.

The three issues in this case are: (1) Did Whitrock waive his right to argue that he had a legitimate expectation of privacy in a searched duplex when he abandoned this argument before the lower courts?; (2) Should the stereo equipment which Whitrock was convicted of stealing be suppressed for use as evidence on the ground that police officers illegally entered the duplex?; and (3) Should the stereo equipment be suppressed for use as evidence on the ground that it was illegally searched?

We first conclude that Whitrock did not waive his right to argue before this court that he had a legitimate expectation of privacy in the duplex. In light of a recent United States Supreme Court decision, *Minnesota v. Olson,* 110 S. Ct. 1684 (1990), it is clearly in the best interests of justice to address the merits of this issue. We next conclude that the stereo equipment should not be suppressed for use as evidence because Whitrock did not have a legitimate expectation of privacy in the searched duplex. In *Olson,* the defendant established that he was an overnight guest of an individual legitimately on the premises, and such was not the case here. Finally, we conclude that the stereo equipment should not be suppressed on the ground that the stereo equipment was illegally searched, because Whitrock did not have a legitimate expectation of privacy in the stolen stereo equipment.

The relevant facts follow. Chris Whaley rented the downstairs portion of a duplex at 232 Sara Street, Eau Claire, from Paul Woita, the owner of the duplex. Wha-

ley rented the duplex[1] according to a month-to-month lease. When Whaley did not make her rental payments, Woita served her with a "Notice Terminating Tenancy" on November 18, 1987. Believing that Whaley had vacated the premises, Woita went to the duplex on December 20, 1987 and discovered eight to ten men, including James Bakeman, in the duplex without his permission. Whaley was not on the premises. Woita told Bakeman to leave the duplex, and on the advice of an attorney served him with an eviction notice on December 21, 1987. On December 24, 1987, on the advice of Karen Johnson, the manager of another apartment complex, Woita called the police department and talked to Officer Donn Adams.

After Woita explained the situation to Officer Adams and signed a "Consent for Search" form, police officers accompanied Woita to the duplex. The officers entered the duplex without a warrant, and observed three individuals: Bakeman, Spencer Holden and Whitrock. The police officers arrested the three men for criminal trespass and then searched the duplex for evidence of occupancy. The officers discovered papers with Whaley's name on them and papers with Bakeman's name on them, as well as various other items (e.g., luggage, identification cards) belonging to other people. During this search, the officers also identified two pieces of stereo equipment. None of the individuals claimed ownership of the equipment according to Officer Adams. One of the officers moved the stereo and recorded a serial number. A check of the serial number indicated that the stereo components had been stolen. Whitrock later told Officer Adams that he was one of two individu-

---

[1]For ease of reference, the term "duplex" in this opinion is used to describe only the downstairs portion of the duplex.

966

als who had stolen the stereo equipment. Whitrock was charged with one count of burglary.

On June 14, 1988, Whitrock filed a "Motion to Suppress Evidence" on the grounds that the search and seizure of the stereo equipment violated his fourth amendment[2] and state constitutional rights. At the suppression hearing on August 17, 1988, Bakeman testified that he had lived at 232 Sara Street with the permission of Whaley from the middle of November 1987, until his arrest, although he had not signed a rental agreement with Woita. He testified that Whaley had not abandoned the premises, but he did not know where she was on December 24, 1987. Bakeman testified that he had a key to the duplex, and both his and Whaley's personal effects were at the duplex. Bakeman testified that Whitrock was a friend of his and had frequently stayed overnight, although Whitrock did not have a key and could not freely let people in and out of the duplex.

Bakeman testified that when Woita had first come to the duplex on December 20, he offered to pay him rent, although he had no income. He also testified that when Woita and the officers arrived on December 24, he objected to their entry and search. He also testified that the stereo equipment did not belong to Whitrock, but he did not know who owned it.

At the suppression hearing, Whitrock confirmed Bakeman's assertion that Whitrock had frequently stayed at 232 Sara Street at Bakeman's invitation, and stated that he considered the duplex to be Bakeman's home. Whitrock also alleged that he had originally claimed ownership of the stereo equipment, that Bakeman was just using it, and that Bakeman knew that the stereo equipment belonged to Whitrock.

---

[2]U.S. Const. amend. IV.

The circuit court denied the motion to suppress based on its reasoning that the occupants were there without Woita's permission, that the police officers went to the duplex on a criminal trespass complaint and that they searched the duplex for evidence of occupancy, not stolen property. On August 31, 1988, Whitrock pled guilty to one count of burglary. Section 943.10(1)(a), Stats.

Whitrock appealed his conviction and the circuit court's denial of his motion for post-conviction relief. In affirming Whitrock's conviction, the court of appeals held that Whitrock did not have a reasonable expectation of privacy in either the premises or the stereo equipment. *Whitrock,* 153 Wis. 2d at 708. This case is before this court as a result of a petition for review, pursuant to sec. (Rule) 809.62, Stats.

## I.

In support of his "Motion to Suppress Evidence," Whitrock argued that he had a legitimate expectation of privacy in the duplex, and thus had standing to object to the warrantless search conducted by the police officers. *See Rakas v. Illinois,* 439 U.S. 128, 140 (1978). In his motion for post-conviction relief, before the court of appeals, and initially before this court, Whitrock abandoned his contention that he had a legitimate expectation of privacy in the duplex. He conceded that he could not contest the police officers' entry into the duplex and argued that he had a legitimate expectation of privacy in the duplex because of our holding in *State v. Fillyaw,* 104 Wis. 2d 700, 312 N.W.2d 795 (1981).[3] Instead, he argued

[3]This court stated in *Fillyaw:* "[w]e do not find it reasonable that a babysitter and a houseguest would have an expectation of

that he had a legitimate expectation of privacy in the stereo equipment.

Subsequently, the United States Supreme Court held that an overnight guest could have a legitimate expectation of privacy in his or her host's home. *Olson,* 110 S. Ct. 1684. Whitrock filed, and we granted, a motion for supplemental briefing, to address (1) the impact of *Olson* on this case, and (2) whether Whitrock had waived his right to argue that he had an expectation of privacy in the duplex.

The State has vigorously argued that this court should not reach the merits of whether Whitrock had a legitimate expectation of privacy in the duplex, primarily on the ground that Whitrock did not have to concede this argument, but could have distinguished this case from *Fillyaw.* When examining this issue in light of applicable Wisconsin case law, however, it is apparent that it is in the best interests of justice to address this issue.

■

First, the general rule in Wisconsin is that the court will not consider an issue raised for the first time on appeal, because, "[i]f the question had been raised below, the situation might have been met by the opposite party by way of amendment or of additional proof." *Terpstra v. Soiltest, Inc.,* 63 Wis. 2d 585, 593, 218 N.W.2d 129 (1974) (quoting *Cappon v. O'Day,* 165 Wis. 486, 490, 162 N.W. 655 (1917)). In this case, Whitrock argued before the circuit court, and the circuit court addressed in its decision, the question of whether he had a legitimate expectation of privacy in the premises. The question was raised earlier, and the rule repeated in *Terpstra* is not strictly applicable.

privacy of constitutional magnitude in the home of another." *Fillyaw,* 104 Wis. 2d at 715.

Second, this court may consider a constitutional issue raised for the first time on appeal at its discretion. *In Interest of Baby Girl K.,* 113 Wis. 2d 429, 448, 335 N.W.2d 846 (1983). This court will exercise this discretion if, "it is in the best interests of justice to do so, if both parties have had the opportunity to brief the issue and if there are no factual issues that need resolution." *Baby Girl K.,* 113 Wis. 2d at 448 (quoting *Laufenberg v. Cosmetology Examining Bd.,* 87 Wis. 2d 175, 187, 274 N.W.2d 618 (1979); *State v. Yellow Freight System, Inc.,* 101 Wis. 2d 142, 158, 303 N.W.2d 834 (1981)). In light of the significance of *Olson,* and its potential effect on *Fillyaw,* it is clearly in the best interests of justice to decide this issue on the merits. Both parties were given the opportunity to fully brief this issue before this court, and there are no factual issues which need resolution. *See also State v. Dyess,* 124 Wis. 2d 525, 535–36, 370 N.W.2d 222 (1985) (This court may consider issues not raised by objection at trial if it appears to the court to be in the interests of good judicial administration to do so.).

For these reasons, we exercise our discretion to address both privacy interests (the duplex and the stereo equipment) claimed by Whitrock.

## II.

At the outset of our discussion of whether Whitrock's fourth amendment rights were violated when (a) the police officers entered the duplex, and (b) a police officer moved the stereo equipment, it is helpful to briefly summarize the analysis we undertake to reach our conclusions. The police activity in this case violated Whitrock's fourth amendment right to privacy only if it

represented a search under the fourth amendment, and if that search was unreasonable. With regard to both the duplex entry and the stereo inspection, we conclude that although each involved a separate "search," neither was a "search under the fourth amendment," because Whitrock did not have a legitimate expectation of privacy in either the duplex or the stereo equipment. We reach this conclusion in the case of the duplex entry by applying the factors we proposed in *Fillyaw,* 104 Wis. 2d at 711 n.6, because the *Fillyaw* fact pattern was similar to this case and involved a legitimate expectation of privacy in an apartment.

We reach the same conclusion concerning the stereo equipment by examining the totality of the circumstances, and applying factors that have been used by the United States Supreme Court in determining whether an individual has a privacy interest in personal effects. Understandably, much of the analysis of both of these searches overlaps.

Technically, these conclusions determine this case. Because Whitrock also argues that the conduct of the police officers was unreasonable, and in order to clarify search and seizure law in Wisconsin, we address the other required factor necessary to find a violation of the fourth amendment; that the search be unreasonable. We conclude in both instances that the police activity was reasonable. Concerning the warrantless entry into the duplex, we conclude that the police activity was reasonable, because the record indicates that the occupancy of those present in the duplex was unauthorized, and the landlord had authority to consent to the police entry. Whitrock argues to the contrary, alleging that he and Bakeman were legitimately on the premises. Even if this were the case, the police properly entered the duplex under the reasonable belief that the landlord had author-

ity to consent to their entry. *See Illinois v. Rodriguez,* 110 S. Ct. 2793 (1990).

Concerning the search of the stereo equipment, we find that the police action was reasonable under the circumstances because this search was necessary in carrying out their responsibilities as law enforcement officers, in determining the occupancy of a duplex that the landlord believed to be vacated by the tenant pursuant to the "Notice Terminating Tenancy."

The defendant filed a "Motion to Suppress Evidence Illegal Premises Search" on June 14, 1988, asserting that "the search and resulting taking of the articles from the premises" violated his constitutional rights. A hearing on the motion was held on August 17, 1988.

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas,* 439 U.S. at 131 n.1. *See also Simmons v. United States,* 390 U.S. 377, 389–90 (1968); *Jones v. United States,* 362 U.S. 257, 261 (1960). Accordingly, it is not the State's burden to show that Whitrock did not have a fourth amendment interest that was violated. As the United States Supreme Court stated in *Rawlings v. Kentucky,* "[p]etitioner, of course, bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy . . .." *Rawlings,* 448 U.S. 98, 104 (1980). *See also State v. Rewolinski,* 159 Wis. 2d 1, 464 N.W.2d 401 (1990), in which we stated, "it is clear that the defendant bears the burden of proof on the question of whether his subjective expectation of privacy was reasonable . . .. The burden of proof applicable is by a preponderance of the credible evidence." *Rewolinski,* 159 Wis. 2d at 16 (citing *State v. Edwards,* 98 Wis. 2d 367, 377, 297 N.W.2d 12 (1980);

*State v. Rogers,* 148 Wis. 2d 243, 247, 435 N.W.2d 275 (1988)).

In reviewing a denial of a suppression motion, we will uphold the trial court's findings of fact unless they are against the great weight and clear preponderance of the evidence. Whether these facts satisfy the constitutional requirement of reasonableness presents a question of law, and we are not bound by the lower courts' decisions on that issue. *State v. Jackson,* 147 Wis. 2d 824, 829, 434 N.W.2d 386 (1989). With these principles in mind, we next examine whether Whitrock had a legitimate expectation of privacy in the duplex.

Capacity to claim the protection of the fourth amendment depends "not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas,* 439 U.S. at 143 (citing *Katz v. United States,* 389 U.S. 347, 353 (1967)). In *Katz,* the Supreme Court rejected the notion that the fourth amendment protects places or property, and held that it protects people against unreasonable searches and seizures. *Katz,* 389 U.S. at 353. The scope of fourth amendment protection must be determined by the "scope of privacy that a free people legitimately may expect." *Rakas,* 439 U.S. at 151. Thus, this expectation of privacy must not only be actual (subjective), but also "one that society is prepared to recognize as 'reasonable.' " *Katz,* 389 U.S. at 361 (Harlan, J., concurring).

The concept of the reasonableness of an expectation of privacy under the fourth amendment is a fluid one. In considering whether a privacy expectation is reasonable, the Supreme Court has not recognized a single factor as determinative. *Rakas,* 439 U.S. at 152 (Powell, J., con-

curring). A reasonable expectation is one which is constitutionally "justifiable." *United States v. White,* 401 U.S. 745, 752 (1971). This court has consistently applied a "totality of the circumstances" approach in determining the legal issue of whether the defendant has a legitimate expectation of privacy. *See, e.g., State v. Cleveland,* 118 Wis. 2d 615, 633, 348 N.W.2d 512 (1984); *Fillyaw,* 104 Wis. 2d at 729 (Abrahamson, J., concurring). Additionally, this court has identified relevant elements to be considered (although not controlling) in determining whether the defendant has a legitimate expectation of privacy. *See Fillyaw,* 104 Wis. 2d at 711-12 n.6; *Rewolinski,* 159 Wis. 2d at 17-18. These factors are: (1) whether the defendant had a property interest in the premises, (2) whether he was legitimately (lawfully) on the premises; (3) whether he had complete dominion and control and the right to exclude others; (4) whether he took precautions customarily taken by those seeking privacy; (5) whether he put the property to some private use; and (6) whether the claim of privacy is consistent with historical notions of privacy. *Rewolinski,* 159 Wis. 2d at 17-18. Analyzing this issue in light of these factors indicates that Whitrock did not have a reasonable expectation of privacy in the duplex.

First, while property rights are no longer determinative after *Katz,* they "reflect society's explicit recognition of a person's authority to act as he wishes in certain areas, and therefore should be considered in determining whether an individual's expectations of privacy are reasonable." *Rakas,* 439 U.S. at 153 (Powell, J., concurring). Whitrock had no property interest in the searched duplex. The United States Supreme Court held in *Olson* that an individual can have a reasonable expectation of privacy in premises in which he does not have a property interest. While we do not suggest that Whitrock must

have a property interest in the duplex before his privacy interest is reasonable, without a property interest there is less support for his claim that he had a reasonable expectation of privacy in the duplex.

Second, neither Bakeman nor Whitrock was legitimately on the premises. Although the landlord may not yet have completed the eviction proceedings with the tenant Whaley, he believed she had vacated the residence. The landlord did not consent to the presence of Bakeman or Whitrock. The only evidence that Bakeman or Whitrock were legitimately on the premises was Bakeman's claim that he was on the premises at the invitation of Whaley. Because the circumstances surrounding the tenancy of the duplex were ambiguous, the police officers did not have to accept Bakeman's claim at face value without further inquiry. *See* 2 W. LaFave, *Search & Seizure,* sec. 6.6(b), p. 709 (2d ed. 1987). Based on Bakeman's supposedly permitted presence in the duplex, Whitrock attempts to characterize this case as a landlord/tenant dispute, arguing that before the landlord could legally enter the duplex, he had to pursue eviction procedures against Bakeman pursuant to secs. 799.40–.45, Stats. While these sections apply to landlord/tenant disputes generally, they do not apply to this case. Woita in this case was not evicting a party to the lease, but rather was acting on his concern that the legal tenant had vacated the premises and the duplex had since been occupied by non-tenants.[4] Whitrock charac-

---

[4]It is at this point of the analysis where the dissent's reasoning is flawed. This decision does not jeopardize tenant rights to privacy, or suggest that a landlord can circumvent applicable landlord-tenant law. The dissent suggests that the landlord violated Wis. Admin. Code, sec. Ag 134.09(2) (1990) by entering the duplex without complying with that section, and without entering based on one of the listed exceptions (dissenting op. at 996 n.3).

975

terizes Woita's actions in allowing police officers to enter the duplex as legal "self-help." On the contrary, Woita had reason to believe that the tenant had vacated, and he had not rented the duplex to the individuals occupying it.

Again, we do not conclude that an individual who is not legitimately on the premises can never have a reasonable expectation of privacy in those premises. The United States Supreme Court has definitively stated that the phrase, "legitimately on premises," creates "too broad a gauge for measurement of Fourth Amendment rights." *Rakas,* 439 U.S. at 142. We therefore do not suggest that this factor alone determines our conclusion that Whitrock did not have a legitimate expectation of privacy in the duplex. Still, the fact that Whitrock was not legitimately on the premises weakens his claim that he had a reasonable expectation of privacy in the duplex.

---

Section Ag 134.09(2) provides, in part: "This subsection does not apply to situations where . . . the tenant is absent and the landlord reasonably believes that entry is necessary to protect the premises from damage . . .." The facts in this case support a conclusion that Whaley was absent and Woita reasonably believed that entry was necessary to prevent damage.

The dissent concludes that Whaley was legitimately on the premises; she authorized Bakeman to be on the premises, and Bakeman therefore could authorize Whitrock's presence as an overnight guest (dissenting op. at 1000). This inference derives only from the self-serving statements of Bakeman and Whitrock (the tenant Whaley did not testify at Whitrock's preliminary hearing). This testimony does not satisfy Whitrock's burden to prove his legitimate expectation of privacy in the duplex by a preponderance of the credible evidence. *See Rewolinski,* 159 Wis. 2d at 16. Despite the dissent's protestations, we refuse to shift this burden to the State (i.e., to require it to prove that Whitrock's expectation of privacy was not legitimate).

Third, Whitrock clearly did not have complete dominion and control over the duplex. He was perceived by Woita to be a trespasser. He did not have a key to the duplex and did not have any right to exclude other persons from the duplex. *See Rawlings,* 448 U.S. at 105.

Fourth, Whitrock did not take precautions customarily taken by those seeking privacy. He did not obtain a key to the duplex. Additionally, Bakeman never claimed that he was a tenant of the duplex, but rather that he was Whaley's guest. Hence, when Whitrock stated at the suppression hearing that he understood that the duplex was Bakeman's home, it suggests that he did not ask if Bakeman had rented the duplex. Normally, one who expects privacy in a residence will take steps to determine who controls the residence, particularly in a case like this, where significant numbers of people congregate (as evidenced by statements of Officer Adams and Woita). Whitrock's storing the stereo equipment in the duplex is inconsistent with the actions of someone who wants to maintain a private, protective environment for such equipment. People generally store their valuable property in a place such as their primary residence, where they are better able to control the access of others to the residence. To the contrary, Whitrock's actions in this case suggest an intent to disassociate himself from the stereo equipment.

Fifth, there is limited evidence that Whitrock put the duplex to some private use. He testified that he had a pair of pants, a shirt and a few tapes there, in addition to the stereo equipment he had stolen. He also testified that he had been a frequent overnight guest of Bakeman's. Other than this testimony, there was no other evidence that Whitrock had put the duplex to some private use. Bakeman testified that Whitrock did

not have a key to the residence, and that he did not have a right to let people in and out as he wanted.

Finally, Whitrock's claim of privacy is not "consistent with historical notions of privacy." This factor was highlighted in *United States v. Chadwick,* 433 U.S. 1, 7–9 (1976). The Supreme Court there addressed the concerns of the framers of the fourth amendment that the abusive searches of customs officials and other agents of the King not be repeated. In light of these concerns, the Court concluded, "the Framers were men who focused on the wrongs of that day but who intended the Fourth Amendment to safeguard fundamental values which would far outlast the specific abuses which gave it birth." *Chadwick,* 433 U.S. at 9.

Earlier, the Supreme Court found, in *Frank v. Maryland,* that from a historical analysis of the fourth amendment, two protections against official invasion emerged. *Frank,* 359 U.S. 360, 362–65 (1958). The first of these protections was the right to be secure from intrusion into personal privacy. The second of these protections was "the right to resist unauthorized entry which has as its design the securing of information to fortify the coercive power of the state against the individual, information which may be used to effect a further deprivation of life or liberty or property." *Id.* at 365. This protection reflected the framers' concern that individuals be free from the "ransacking by Crown officers of the homes of citizens in search of evidence of crime or of illegally imported goods." *Id.* at 363. Here, the police officers were not taking coercive action to search for evidence of a crime, and Whitrock's right to be secure from intrusion did not rise to the level of "reasonable."

Whitrock contends that in light of *Olson, Fillyaw* is no longer good law, and that by virtue of his status as an overnight guest, Whitrock has a per se legitimate expec-

978

tation of privacy. We agree that insofar as *Fillyaw* is read for the proposition that an overnight guest does not have a legitimate expectation of privacy in the home of another, it is inaccurate in light of *Olson. Fillyaw,* 104 Wis. 2d at 715. However, *Olson* does not control this case because Whitrock has not established his status as an overnight guest as did Olson.

In *Olson,* the United States Supreme Court held that a warrantless, nonconsensual entry into a home where the defendant in a murder charge was an overnight guest violated the defendant's fourth amendment rights. *Olson,* 110 S. Ct. at 1684. In *Olson,* the defendant had been staying with the legitimate occupants of an upper unit duplex. After the occupant of the lower unit confirmed this fact, the police entered the upper unit without permission and found the defendant hiding in a closet. *Id.* at 1687. The Court concluded that "Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.* at 1688. *See* 4 LaFave, *supra,* sec. 11.3 (Supp. 1991).

Much of the Supreme Court's reasoning in reaching this conclusion is summarized in its statement, "[t]hat the guest has a host who has ultimate control of the house is not inconsistent with the guest having a legitimate expectation of privacy." *Id.* at 1689. It is evident in the Court's reasoning that the overnight guest's expectation of privacy derives from the expectation of privacy of the host.[5] In such a situation, the guest's expectation of

---

[5]For example, the Court also states, "[t]he houseguest is there with the permission of his host, who is willing to share his house and his privacy with his guest . . . .. The host may admit or exclude from the house as he prefers . . . but the latter, [hosts] who have the authority to exclude despite the wishes of the guest, will often be accommodating." *Olson,* 110 S. Ct. at 1689.

privacy is "rooted in 'understandings that are recognized and permitted by society.' " *Id.* at 1690 (citing *Rakas,* 439 U.S. at 144 n.12).

In this case, by contrast, Whitrock's expectation of privacy is not "recognized and permitted by society." Whitrock was not an overnight guest, and was not entitled to the immunity granted by the Supreme Court's holding in *Olson.*[6] In *Olson,* the Court went to great lengths to explain why an overnight guest has a legitimate expectation of privacy in his host's home. While the Court did not define "overnight guest," the implicit presumption is that a guest enjoys this status by virtue of the host's "ultimate control of the house." *Olson,* 110 S. Ct. at 1689. Bakeman, his alleged "host," had a tenuous connection with the duplex at best. Under the circumstances of this case, it is incorrect to suggest that Bakeman had "ultimate control of the house." While Bakeman alleged that he was there with the permission of Whaley, and did have a key to the duplex, he was also

---

[6]The dissent fails to acknowledge the constitutional underpinnings of the *Olson* decision. Rather, the dissent focuses its argument on landlord-tenant laws, in an attempt to classify Whitrock as an "overnight guest," a classification undefined by the Supreme Court. In its narrow attempt to legitimate Bakeman's and Whitrock's presence in the duplex, the dissent ignores the wealth of constitutional law which has discussed a legitimate expectation of privacy, one that society is prepared to recognize as reasonable *(see Rakas,* 439 U.S. at 143–44; *Katz,* 389 U.S. at 361). Rather than examining Whitrock's status in light of constitutional law, the dissent chooses to limit its analysis to whether Whaley and Bakeman had been properly evicted, in an attempt to legitimate Whitrock's presence in the duplex. Since Whitrock was not an "overnight guest," *Olson* does not control this case. Without the benefit of *Olson,* even Whitrock conceded that he did not have a legitimate expectation of privacy in the duplex. *(See* Defendant-Appellant-Petitioner's Brief n.2.)

told by the landlord that he should not be there. Bakeman was not a party to a rental agreement, did not pay rent, and had been served with an eviction notice by Woita.

The holding in *Olson* does not rest with an artificial definition of what constitutes an "overnight guest" or a "houseguest." Based on our examination of Whitrock's claimed privacy interest in the duplex, we conclude that his expectation of privacy was not "rooted in understandings that are recognized and permitted by society." He was not an overnight guest of a host with ultimate control of the house, and he has not established by a preponderance of the evidence that his privacy expectation was reasonable. Unlike the dissent, we are not prepared to conclude that Wisconsin law recognizes as reasonable the privacy expectations of individuals strictly on their status as "occupants" of a rented unit (dissenting op. at 996-997). Therefore, Whitrock did not have a legitimate expectation of privacy in the duplex, and a search within the meaning of the fourth amendment did not occur. *See Florida v. Riley,* 488 U.S. 445, 455 (1989) (O'Connor, J., concurring). For these reasons, his challenge to the police entry must fail.

Even were Whitrock to establish that he had a legitimate expectation of privacy in the duplex, the evidence would not be suppressed based on the officers' entry into the duplex because the conduct was reasonable under the "reasonable belief" standard of *Rodriguez,* 110 S. Ct. at 2800.

The ultimate standard in the fourth amendment is the reasonableness of the search or seizure in light of the facts and circumstances of the case. *Bies v. State,* 76 Wis. 2d 457, 468, 251 N.W.2d 461 (1977) (citing *Cady v.*

981

*Dombrowski,* 413 U.S. 433 (1973)). A fundamental rule applicable to searches and seizures is that warrantless searches are per se unreasonable under the fourth amendment except under well-defined circumstances. *State v. Bell,* 62 Wis. 2d 534, 540, 215 N.W.2d 535 (1974) (citing *Coolidge v. New Hampshire,* 403 U.S. 443 (1971)). The fourth amendment does not protect an individual from all searches, rather it protects him or her from searches and seizures which are "unreasonable."[7] *Rodriguez,* 110 S. Ct. at 2801. In *Rodriguez,* the Supreme Court rejected the proposition that a government officer's judgment must not only be responsible, but also correct. *Id.* at 2799. Rather,

---

[7]We discussed generally the fourth amendment's proscription against "unreasonable" searches and seizures in *State v. Boggess,* 115 Wis. 2d 443, 340 N.W. 2d 516 (1983). In that case, the defendant was charged with several counts of child abuse after a social worker and a police officer made a warrantless entry into his house in response to an anonymous tip that children had been battered and were in need of medical attention. *Boggess,* 115 Wis. 2d 443. Notwithstanding the fact that the condition of the children (both children had multiple bruises, one child was missing hair from the top of his head and a part of his lip) supported the emergency nature of the situation and the need for a warrantless entry, the dissenting opinion contended that the conviction should be reversed on the ground that the social worker did not have reasonable grounds to believe that an emergency existed. *Id.* at 465 (Abrahamson, J., dissenting). Three members of this court declared, "[t]he founding fathers left us with the means to protect ourselves from tyranny but they defined it in terms of human reasonableness. They did not direct or authorize us to substitute in its place some fanciful definition of what is reasonable." *Id.* at 461 (Day, J., concurring). Here, as in *Boggess,* the dissent attempts to frustrate this court's definition of "reasonable," and loses sight of what constitutes reasonable behavior.

> In order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable.

*Id.* at 2800. Thus, the police officers' belief that the landlord had authority to consent to the entry into Whaley's duplex must have been reasonable, even if it was not factually correct.

Whitrock insists that the police officers here did not "reasonably believe" that the landlord had authority to consent to their entry into the duplex. He claims that their reliance was unreasonable because they made no factual investigation into the landlord's claim. Whitrock suggests that only by verifying the legal status of the duplex occupants by demanding a circuit court judgment of eviction or writ of restitution would the police be authorized to enter the duplex and remove the occupants. Otherwise, Whitrock contends, the landlord can engage in self-help by contacting the police and signing a consent form whenever a landlord/tenant dispute arises.

The facts in this record illustrate that this was not an exercise of "self-help" by the landlord.[8] The landlord had served his tenant (Whaley) with a "Notice Termi-

---

[8]The dismay we have caused the dissent (dissenting op. at 1005) is more imagined than real. We do not hold that, as a matter of law, police officers act reasonably when they rely on the word of a landlord who claims the right to enter an apartment over the word of an occupant who claims the right of a tenant. On the contrary, our decision results from the unique facts of this case, which indicate that the police officers had legitimate cause to question Bakeman's claimed tenancy.

nating Tenancy" on November 18, 1987. He found Bakeman and eight to ten other men but not Whaley in the duplex on December 20. He was upset to find people in the duplex and told them to get out of the duplex because he had not rented it to Bakeman. On December 21, he served an eviction notice on Bakeman on the advice of his attorney. On December 24, Woita called the police, who asked him to come to the police station to discuss the situation more thoroughly and sign a consent form. The police department had previously taken a number of calls from an apartment manager concerning the individuals at 232 Sara Street, but the police department refused to take action without a complaint by the landlord. Woita explained to Officer Adams that he wanted the individuals out of the duplex, because he had not given them permission to be there, and he was afraid of the damage they might cause to the duplex. At the time he called the police department, he believed that Whaley had vacated the premises.

This case is not about a dispute between Woita and Whaley.[9] Whaley was leasing the apartment from Woita on a month-to-month basis, and Woita had terminated her tenancy pursuant to sec. 704.17(1)(a), Stats. [10] This

[9]Again, in contrast to the manner in which the dissent would paint this controversy, Woita was not attempting to "retake possession from a defaulting tenant" (dissenting op. at 1003). For such an action, Woita was required to proceed according to Wisconsin landlord-tenant laws, as he did with Whaley. In this case, Woita was attempting to oust other occupants of the duplex, occupants who did not have a rental agreement with him. The circuit court judge also recognized this when he stated. "[i]t's quite obvious that any clear landlord-tenant relationship would have been between the landlord Woita and Whaley."

[10]Section 704.17(1)(a), Stats., provides:

984

section indicates that a tenancy can be terminated after five or fourteen days. While Whitrock contends that Woita should have pursued the eviction procedure prescribed in secs. 799.40–.45, Stats., there was little evidence that Whaley had not left the premises. While the record does not affirmatively establish that Whaley had vacated the duplex,[11] it was reasonable for the police to believe that Whaley had responded to the Notice Terminating Tenancy and left the duplex, and that the presence of the occupants of the duplex was unauthorized. They also reasonably believed that Woita had the authority to consent to their entry into the apartment based on his concern that the duplex may be damaged, and his right to prevent such damage.[12] For these rea-

Notice terminating tenancies for failure to pay rent or other breach by tenant. (1) MONTH-TO-MONTH AND WEEK-TO-WEEK TENANCIES. (a) If a month-to-month tenant or a week-to-week tenant fails to pay rent when due, his tenancy is terminated if the landlord gives the tenant notice requiring the tenant to pay rent or vacate on or before a date at least 5 days after the giving of the notice and if the tenant fails to pay accordingly. A month-to-month tenancy is terminated if the landlord, while the tenant is in default in payment of rent, gives the tenant notice requiring him to vacate on or before a date at least 14 days after the giving of the notice.

[11] Officer Adams testified that the police officers found papers with Whaley's name on them, and Bakeman testified "she didn't hardly have anything in the house," but he later offered totally contradictory testimony when he said "all her property, except for a couple of changes of clothes, were still there." At the very least, these contradictions strain Bakeman's credibility as a witness. He also stated that, after the officers advised the duplex occupants that they were under arrest for criminal trespass, "we began to search the residence to attempt to establish occupancy, who had been staying at that residence *since Miss Whaley vacated the residence.*" (Emphasis added.)

[12] Woita testified at the suppression hearing that Karen Johnson had called him telling him that "the boys [were] wild

sons, we conclude that even if Woita did not have authority to consent to their entry into the duplex, the police officers reasonably believed that he had that authority. To suggest that the police officers cannot have a reasonable belief that they have authorization to enter an apartment without demanding documentary evidence of eviction holds them to a standard not required by *Rodriguez*.[13]

## III.

Whitrock contends that, even if he did not have a legitimate expectation of privacy in the duplex, he did have a legitimate expectation of privacy in the stereo equipment. He asserts that when the police officer moved the equipment to check for evidence of ownership, he conducted a search. *See Arizona v. Hicks,* 480 U.S. 321 (1987). Additionally, he alleges that this search violated his fourth amendment rights, as he had a legitimate expectation to privacy in the stereo equipment. He states that, in light of *Hicks,* it is improper for the State to argue that a thief cannot have a legitimate expectation of privacy in stolen property.

The Supreme Court, in *Hicks,* discussed the nature of a stereo search that had certain similarities to this case. In *Hicks,* police officers arrived at and entered

---

again last night." He also testified that "[t]hey had already done probably over a thousand dollars worth of damage to the place now."

[13]To require documentary evidence of actual eviction would, in effect, vacate the concept that the police officer's belief be reasonable if not correct. *Rodriguez* only requires that the facts must "warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Rodriguez,* 110 S. Ct. at 2801 (quoting *Terry v. Ohio,* 392 U.S. 1, 21-22 (1968)).

Hicks' apartment in response to the fact that a bullet had been fired through the floor of his apartment, injuring a man in the apartment below. Police officers found and seized three weapons while they searched for the shooter, other victims and for weapons. While there, one of the officers noted some stereo components, which seemed to be out of place in the squalid apartment. Suspecting that the stereo components were stolen, he moved them, read and recorded their numbers. After being advised by headquarters that the components were indeed stolen, the police officers seized the components.

In *Hicks*, the parties conceded that the initial warrantless entry and search were justified by the exigent circumstance of the shooting. The Court did not address the stereo search in terms of whether Hicks had a "legitimate expectation of privacy" in the components. Rather, the Court addressed the question of whether the "plain view" doctrine applied to a search which was unrelated to the initial reason for entering the premises, and the officer did not have probable cause to search the stereo components. In reaching its conclusion that the plain view doctrine did not protect such a search, the Court asked two questions: (1) Did a search occur?, and (2) If a search occurred, was the conduct of the officers unreasonable under the fourth amendment?

The Court first addressed the question of whether a search had occurred in *Hicks*. The Supreme Court, quite understandably, has never managed to set out a comprehensive definition of the word, "search," as it is used in the fourth amendment. 1 LaFave, *supra,* sec. 2.1(a), p. 302. In *Hicks,* however, the Supreme Court stated: "[b]ut taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion of the respondent's privacy unjustified by the

exigent circumstance that validated the entry." *Hicks,* 480 U.S. at 325. It is interesting to note that the Supreme Court used the language, "unrelated to the objectives of the authorized intrusion," because it suggests that if the search of the stereo equipment was related to the objective of the initial entry, that search would be less likely to be a new invasion of the respondent's privacy.

While the *Hicks* majority did not discuss the search in terms of an invasion of Hicks' legitimate expectation of privacy, it is implicit in *Hicks* that such an expectation can exist in stereo equipment such as this. Since *Katz,* the Court has defined searches and seizures which are protected by the fourth amendment, as those which violate an individual's legitimate or reasonable expectation of privacy. *See Terry,* 392 U.S. 1. Because of *Katz* and its successors, a search under the fourth amendment could not have occurred had Hicks not had a legitimate expectation of privacy in the stereo components.

In this case, the question of whether Whitrock had a legitimate expectation of privacy in the stereo equipment is more difficult to ascertain. While the stereo was stolen, we are constrained from adopting a "bright line" rule that this negates any legitimate expectation of privacy that Whitrock may have in light of *Hicks.* The exclusionary rule protects not just the guilty, but the innocent as well. The purpose of the rule is not just to deter unreasonable searches and to maintain judicial integrity, but also to assure "all potential victims of unlawful government conduct—that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government." *United States v. Calandra,* 414 U.S. 338, 357 (1974) (Brennan, J., dissenting). *See also* 1 LaFave, *supra,* sec. 1.1(f), p. 17. Were it possible to adopt a bright

line rule that thieves do not have a legitimate expectation of privacy in stolen property, this would reduce the incentive of law enforcement officers to adhere to the tenets of the fourth amendment, and would increase the risk of seriously undermining popular trust in government.[14]

We conclude that Whitrock did not have a legitimate expectation of privacy in the stereo equipment. Specifically, Whitrock did not have a privacy expectation that "society is prepared to recognize as reasonable." *See Katz*, 389 U.S. at 361. Whether an individual has a reasonable expectation of privacy is determined by examining the totality of the circumstances. *Cleveland*, 118 Wis. 2d at 633. In determining reasonableness, this court must also balance the interests of society and the individual claiming the privacy interest. *Hudson v. Palmer*, 468 U.S. 517, 527 (1984).

Examining the record using a totality of the circumstances approach, it is clear that Whitrock has not borne the burden of proof on the question of whether his expectation of privacy was reasonable. *See Rewolinski*, 159 Wis. 2d at 16. First, Whitrock did not assert dominion or control over the stereo equipment. *See Cleveland*, 118 Wis. 2d at 634; *Rakas*, 439 U.S. at 149. Officer Adams testified that at the time of the search, Whitrock

[14]In any situation where police officers were legitimately on the premises, they would lose nothing by conducting a search for illegal or stolen property if such a bright line rule existed. If the property is indeed stolen, it could not be suppressed under the exclusionary rule. If the property was not stolen, innocent people would find their privacy invaded and have no remedy. *(See* Justice Heffernan's analysis of the complexities and inadequacies of the exclusionary rule; *Conrad v. State,* 63 Wis. 2d 616, 218 N.W. 2d 252 (1974)).

did not admit ownership of the equipment, although he later admitted to having stolen it. Bakeman, his alleged host, did not claim ownership of the equipment at the time of the search, and testified at the suppression hearing that the stereo equipment did not belong to Whitrock and he did not know who it belonged to. Although Whitrock claimed at the suppression hearing that he had originally claimed ownership of the stereo equipment, and that Bakeman knew it belonged to Whitrock, nothing else in the record substantiates this claim. He did not testify as to how he had obtained the stereo equipment. Even were we to accept his allegation that he claimed ownership of the stereo equipment at the time of the search, like the defendant in *Rawlings*, this does not entitle him to challenge the search regardless of his expectation of privacy. *See Rawlings,* 448 U.S. at 105.

Second, Whitrock did not take precautions to maintain his privacy in the stereo equipment. *See id.* Whitrock testified that the duplex at 232 Sara Street was not his residence address. He kept the stereo equipment at 232 Sara Street with the knowledge that others were staying there. He did not have a key to the duplex, and did not have the authority to prevent others from gaining access to the stereo equipment. He even testified at one point that he had loaned the equipment to Bakeman, although Bakeman did not substantiate this allegation. Bakeman testified at the suppression hearing that the stereo equipment was not Whitrock's, and he had no idea who it belonged to. It is inconceivable that one asserting a privacy interest in valuable equipment would not inform his host that he owned the equipment that appeared in the duplex.

Finally, we conclude that society as a whole possesses no understanding that stereo equipment under these circumstances "deserves the most scrupulous pro-

tection from government intrusion." *California v. Greenwood,* 486 U.S. 35, 43 (1988). While Whitrock's interest in the stereo equipment is distinct from his privacy interest in the premises, these two interests coincide in leading to the conclusion that the stereo equipment did not deserve the most scrupulous protection from government intrusion. The original tenant Whaley was not in the duplex (her whereabouts were unknown) and the landlord did not know who owned the property in the duplex. Had the record established that Whitrock claimed ownership of the stereo equipment before it was moved, society might recognize his expectation of privacy as reasonable. Under the circumstances here, however, where no one claimed ownership of the stereo, and the police officers were searching for evidence of occupancy, society is not prepared to declare that it should be scrupulously protected from government intrusion.

In addition to considering the totality of the circumstances, we balance the interests of society and the defendant to determine the reasonableness of Whitrock's expectation of privacy. In this case, the interest of society is in ensuring that landlords and tenants are secure in the knowledge that their property interests are safeguarded. In this case, Woita believed that the duplex was abandoned. The police officers did not know who owned the personal effects in the duplex. If the property belonged to Whaley, it was certainly in her best interests for the police to safeguard this property. It was also in Woita's best interests to safeguard the property for Whaley to ensure that she would have no recourse against him, should her property be damaged. This societal interest is superior to whatever interest Whitrock had in the stolen stereo equipment.

Because we conclude that Whitrock did not have a legitimate expectation of privacy in the stereo equipment, there was no "search" of the equipment under the fourth amendment.

Additionally, the movement of the stereo equipment was reasonable under the circumstances. LaFave states:

> [i]n addition to their crime prevention and crime detection responsibilities, police are by design or default called upon to render a great variety of other public services. In carrying out these varied responsibilities, the police sometimes conduct searches for some purpose other than that of finding evidence of criminal activity. Generally, it may be said that the courts have upheld such searches when made reasonably and in good faith, even though evidence of crime is inadvertently discovered as a consequence.

2 LaFave, *supra,* sec. 5.5(d), p. 552 (footnotes omitted). The police officers in this instance were looking for evidence of occupancy. It is reasonable for the police officers to believe that by moving the stereo equipment they may discover information identifying the stereo equipment's owner. Often, with expensive equipment the owner will mark it in such a way as to be able to identify it later, should the need arise. Additionally, ownership can be discovered by checking the serial number, if the equipment has been registered with the manufacturer. At the time the police officers moved the equipment, they were not searching for evidence of a crime, but were attempting to determine occupancy of the duplex.

The reasonableness of this action is further bolstered by the officers' belief at the time of the search that none of the occupants owned the stereo equipment. In *Hicks,* the Supreme Court held that a police officer's moving stereo equipment was unreasonable, because he

did not have probable cause to believe that the equipment was stolen. *Hicks,* 480 U.S. at 326. This case is distinguishable, because in this case the police officer did not move the stereo equipment as a result of his belief that the equipment was stolen. Rather, he was examining the stereo equipment to determine who owned it, in an effort to identify who was living in the duplex, a reasonable action considering the fact that the police initially entered the duplex to arrest persons Woita believed to be trespassers. A significantly different purpose existed when police officers entered Hicks' apartment to search for the shooter, victims and for weapons. Once in the apartment, they had no justification for moving the stereo equipment, other than their suspicion that it was stolen. Because the police officers did not have probable cause to believe the stereo equipment was stolen, the Supreme Court held that the search and seizure in *Hicks* was unreasonable. *Hicks,* 480 U.S. at 326. *See South Dakota v. Opperman,* 428 U.S. 364, 370 n.5 (1976) ("The standard of probable cause is peculiarly related to criminal investigations, not routine, non-criminal procedures . . .. The probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations.").

The analysis of the Supreme Court in *Dombrowski* is more applicable to this case. Although *Dombrowski* involved a vehicle search (as was also the case in *Rakas)* rather than an apartment search, the Court pointed out that warrantless searches of vehicles had been sustained even when the possibility of the vehicle being removed was remote or non-existent. *Dombrowski,* 413 U.S. at 441–42. In *Dombrowski,* police officers opened the trunk of the defendant's car, believing that the defendant

owned a firearm. Rather than searching the trunk for evidence of a crime, they opened the trunk to retrieve the firearm so that it would not fall into the hands of vandals. This was a "community caretaking function[ ], totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441. While the Court did not address whether a "search" under the fourth amendment occurred,[15] the Court did find the search to be reasonable without creating a detailed formula for judging such cases.[16] The same analysis is applicable here.

Although we do not establish a per se rule that a search which is not directed towards uncovering evidence of a crime is always reasonable, we conclude that examining the specific facts in this case leads to the conclusion that the police did not act unreasonably, even if a search under the fourth amendment occurred when the police officer moved the stereo equipment.

*By the Court.*—The decision of the court of appeals is affirmed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). According to the majority opinion, a person's home is his or her castle, except when the home is rented. The majority opinion jeopardizes tenants' rights

---

[15]*Dombrowski,* 413 U.S. at 442 n. †.

[16]The Court recognized that the framers of the fourth amendment only provided the general standard of "unreasonableness" as a guide to determining when a warrant was required, and that the Court itself had not usefully refined that standard. *Dombrowski,* 413 U.S. at 448. Based on the analysis of *Dombrowski,* however, we find that this search was not unreasonable per se, and falls within a well-defined exception. *See Bell,* 62 Wis. 2d at 540.

to privacy in their homes and empowers landlords and police officers to enter tenants' homes contrary to Wisconsin law.[1]

The fourth amendment provides that "[t]he right of the people to be secure in their . . . houses . . . shall not be violated." Searches and seizures "inside a home without a warrant are presumptively unreasonable." *Payton v. New York,* 445 U.S. 573, 586 (1980). The majority holds that the defendant had no legitimate expectation of privacy in the apartment in which he was an overnight guest and declares the warrantless search to be constitutional. Because I believe the majority decision conflicts with recent decisions of the United States Supreme Court interpreting the fourth amendment and the expressed policy of the Wisconsin legislature protecting tenants from unauthorized entry by landlords, I dissent.

I conclude that as an overnight guest the defendant had a legitimate expectation of privacy and had the protections of the fourth amendment. A legitimate expectation of privacy is, according to United States Supreme Court cases, an expectation that society is prepared to recognize as reasonable. *State v. Rewolinski,* 159 Wis. 2d 1, 17, 464 N.W.2d 401, 414 (1990) (Abrahamson, J. dissenting).

Wisconsin's landlord-tenant law recognizes and protects the defendant's expectation of privacy in this case.

---

[1]The search in this case occurred on December 24, 1987, when the landlord went to the police station and gave the police his consent to search the apartment occupied by Bakeman and Whaley. Seven officers went to the apartment without a warrant and entered without knocking, ignoring the occupants' demand to see a warrant and the occupants' assertion of their rights. The officers immediately arrested the three men they found in the apartment and then proceeded to search the premises.

Wisconsin law protects the tenant's (and the tenant's guest's) privacy by prohibiting the landlord from entering the premises except under very limited circumstances. Wisconsin law prohibits a landlord from entering a dwelling unit during the tenancy or a holdover tenancy[2] without 12 hour notice to the tenant except under circumstances not applicable here.

The landlord's "concern that the duplex may be damaged," majority op. at 985, or that property damage may have been done in the past does not under Wisconsin law or under fourth amendment law authorize the landlord's entry into a home, the landlord's consent to the police to enter the home, or the police's entry into a home without a warrant. *Payton v. New York,* 445 U.S. 573 (1980). The law provides the landlord the means to remove a tenant other than through the police's forced entry into a rental unit without a warrant.[3] I therefore

---

[2]A "tenant" is defined to include "persons holding over after termination of tenancy until removed from the dwelling unit by sheriff's execution of a judicial writ of restitution." Wis. Adm. Code, sec. Ag 134.02(12).

[3]"No landlord may enter a dwelling unit during tenancy except to inspect the premises, make repairs, or show the premises to prospective tenants or purchasers, except as authorized under s. 704.05(2), Stats. Entry may not be made except upon advance notice and at reasonable times. Advance notice means at least 12 hours advance notice unless the tenant, upon being notified of the proposed entry, consents to a shorter time period. This subsection does not apply to situations where the tenant requests or consents to a proposed entry at a specified time, a health or safety emergency exists, the tenant is absent and the landlord reasonably believes that entry is necessary to protect the premises from damage, or entry is otherwise authorized in writing other than a form provision." Wis. Adm. Code, sec. Ag 134.09(2).

The state has never argued that the entry in this case was based on a health or safety emergency, or the tenant's absence

conclude that the state of Wisconsin has recognized as reasonable the expectation of privacy of occupants of a rented unit.

Furthermore the United States Supreme Court has held that an overnight guest has an expectation of privacy that society is prepared to recognize as reasonable. Under *Minnesota v. Olson,* — U.S. —, 110 S. Ct. 1684 (1990), a United States Supreme Court decision rendered after the circuit court and court of appeals decided this case, the accused's status as an overnight guest is "enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." 110 S. Ct. at 1688.

The majority holds that *Olson* and the Wisconsin landlord-tenant law does not apply to this case and that the defendant had no legitimate expectation of privacy in the apartment where he was an overnight guest, for two reasons: The defendant was the guest of someone not "legitimately on the premises" and the landlord's consent justified the warrantless search.

---

and the landlord's need to protect the premises from damage. *See also,* 3 LaFave *Search and Seizure* sec. 8.5(a), p. 289 (2d ed. 1987) "[T]he landlord of a house is not authorized to consent to a police search of those premises merely because he is empowered under the law to enter for the purpose of viewing waste . . .." Nor does the landlord's suspecting property damage constitute exigent circumstances that would justify an entry into a home without a warrant for search and seizure purposes. *Cf. Payton v. New York,* 445 U.S. 573, 583 (1980).

The pertinent parts of the landlord's testimony at the suppression hearing are appended to this opinion. Officer Adams did not testify what the landlord had told the police. Bakeman and the defendant testified that Whaley lived in the apartment, had property there, and had given them permission to be there.

## I.

As the majority opinion recognizes, the "legitimately on the premises" standard was rejected in *Rakas v. Illinois,* 439 U.S. 128, 142–148 (1978), as too broad. *Minnesota v. Olson,* — U.S. —, —, 110 S. Ct. 1684, 1688 (1990). Nevertheless the majority opinion continues to use this standard. Majority at 976, 980–981.

The majority opinion errs in concluding that the defendant was the guest of someone not legitimately on the premises and therefore neither the defendant nor his host had an expectation of privacy. The only reasonable inference to be drawn from this record is that the tenant (Whaley) had not vacated or abandoned the premises as a tenant voluntarily or involuntarily, that Bakeman occupied the apartment with Whaley's permission, and that the defendant was legitimately on the premises as an overnight guest.

According to the record, Whaley had not vacated the dwelling; her personal property was on the premises.[4] The landlord testified that prior to his giving consent for the police to enter he merely "felt" that Whaley had vacated the premises. Prior to the entry the landlord did not show the officers any documentary or other evidence to support his feeling that the tenant had vacated the

---

[4]The majority opinion, at 966, the state's brief, p. 23, and the officer's testimony assert that the police's search was to find evidence of the "trespasser's" occupancy. The police found evidence of Whaley's and Bakeman's occupancy, namely personal property and letters, some addressed to Whaley and others to Bakeman. This evidence of Whaley's and Bakeman's occupancy is further proof that the defendant had a reasonable expectation of privacy in the apartment. The court determines reasonable expectation of privacy on the basis of everything it learns in the suppression hearing.

apartment or that the apartment was being occupied by criminal trespassers.[5] Bakeman testified that Whaley authorized him to be there. The occupants of the apartment present at the police's entry, including Bakeman and the defendant, claimed possession of the apartment and objected to the search.

The majority opinion properly concludes that the record does not affirmatively establish that Whaley, the tenant, had vacated the apartment. Majority op. at 984–985. The circuit court made no finding that Whaley had abandoned her interest in the apartment. At the suppression hearing the circuit court said that it was "quite clear that apparently Whaley [the tenant] allowed Bakeman [the defendant's host] to use the premises up on Sara Street. There is some question in my mind whether she had actually moved out in response to the eviction notice or had for some other reason not been spending that much time there."[6]

---

[5]The majority implies that the landlord's claim that the occupants of the apartment were trespassers justifies the police officers' reasonable belief in the landlord's consent. This reasoning is not supported by the record. Section 943.14, Stats. 1989–90, defines criminal trespass as follows:

> Whoever intentionally enters the dwelling of another without the consent of some person lawfully upon the premises, under circumstances tending to create or provoke a disturbance of the peace, is guilty of a Class A misdemeanor.

There is no claim that the landlord's call to the police was provoked by a "disturbance of the peace." The landlord testified at the suppression hearing that he "wanted the fellows out of there" because he had not given them permission to be there. See transcript appended hereto.

Furthermore, probable cause to believe a misdemeanor has occurred is not sufficient exigent circumstances for police to enter a dwelling without a warrant.

[6]The majority opinion nevertheless states that it was reason-

Until Whaley voluntarily vacated the dwelling unit or was evicted, that is, removed from the dwelling unit by sheriff's execution of a judicial writ of restitution issued under sec. 799.44, Stats. 1989-90, Whaley was legitimately on the premises and could authorize Bakeman to be on the premises; Bakeman in turn could authorize the defendant to be an overnight guest.

On December 20, 1988, on advice of his lawyer, the landlord began an eviction action against Bakeman in small claims court. Bakeman had until December 31, 1987, to defend the landlord's complaint in the pending small claims action. The warrantless search and seizure occurred on December 24, 1987, while the civil action was pending and before Bakeman's time to respond under the civil eviction action had expired.

The circuit court and the majority opinion did not—and on this record could not—find that the defendant had no legitimate authority to be on the premises.[7]

---

able for the landlord and for the police to believe that Whaley had vacated the premises and that Bakeman's presence was unauthorized. Majority op. at 984-985. The majority opinion does not state the facts from which this belief may reasonably be inferred.

For an extended discussion of the privacy interests of persons whose tenancy status is uncertain, see 1 LaFave *Search and Seizure* sec. 2.3(a) and sec. 8.5(a) (2d ed. 1987). The state in this case argues that Whaley had been properly served with a notice to terminate even though the state concedes that the court cannot determine whether the landlord had complied with the statutory procedures because no exhibits, including the notice, are part of the record.

[7]The circuit court's memorandum opinion makes no explicit findings of fact about the defendant's status. The circuit court opinion contains conflicting comments about the defendant. At one point the circuit court opinion states that the status of people who were arrested is "unclear." At another point the circuit court opinion seems to state that the defendant was on the premises

Under these circumstances, the defendant was, to use the majority's test, a guest of someone legitimately on the premises.

## II.

The majority further errs in concluding that the landlord's consent justified the search. The warrantless search of a home is *per se* unreasonable unless justified by an exception to the warrant requirement. *Payton v. New York*, 445 U.S. 573, 586 (1980). The only exception offered by the state in this case to justify the warrantless search was the consent of the landlord.

Under Wisconsin law, as I have discussed above, the landlord in this case had no right to enter the apartment. Accordingly the landlord in this case had no authority to consent to the officers' entry. The majority's justification of the warrantless search under the doctrine of third

---

illegally. At another point the circuit court opinion characterizes the defendant as a guest.

The record is clear that (1) Chris Whaley was a tenant; (2) the landlord had served Whaley with some notice terminating tenancy; (3) James Bakeman, an occupant of the apartment at the time of arrest had a key to the apartment and claimed that Whaley was still living in the apartment, that he had Whaley's permission to be there, and that he did not know of the notice to Whaley terminating tenancy; (4) Whaley had papers, letters and other personal property on the premises; (5) the landlord did not know whether Whaley had vacated the premises in compliance with the notice, but merely "felt she had vacated the premises"; (6) the landlord served Bakeman with papers initiating a small claims court action for eviction; (7) Bakeman and the defendant said that the defendant was a frequent overnight guest at the apartment; and (8) the defendant did not know of the dispute between the landlord and Whaley and Bakeman.

party consent is therefore incorrect.[8]

The majority concludes that even if the landlord's consent to search the apartment was invalid, the fruits of the search should not be suppressed because the police officers had a reasonable belief that the landlord's consent to the entry was valid. In *Illinois v. Rodriguez,* — U.S. —, 110 S. Ct. 2793 (1990), the United States Supreme Court held that a warrantless entry by the police is valid when based on the consent of a third party "whom the police, at the time of the entry, reasonably believe to possess common authority over the premises, but who in fact does not do so." 110 S. Ct. at 2796.

The majority concludes that because "the police officers had legitimate cause to question Bakeman's tenancy," Majority op. at 983 n.8, the police officers' belief that the landlord had authority to consent to the search was reasonable. The only basis for the police officer's questioning Bakeman's tenancy was the landlord's unsupported assertions. This type of reasoning is precisely what *Rodriguez* warns against.

According to *Rodriguez,* the determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment [of the search or the seizure] 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises? *Terry v. Ohio,* 392 U.S. 1, 21–22 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists." 110 S. Ct. at 2801.

*Rodriguez* warns that officers may not always accept a person's invitation to enter premises. "Even when the invitation is accompanied by an explicit asser-

---

[8]*See generally,* Professor Lafave's discussion of problems involved in a landlord's consent to search in 3 LaFave *Search and Seizure* sec. 8.5(a) (2d ed. 1987).

tion . . . the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." 110 S. Ct. at 2801. The circumstances in this case of the landlord's consent to search the premises of a rented apartment during the pendency of an eviction action and the presence of the occupants asserting their rights presented a situation in which reasonable officers would not act without further inquiry.

Wisconsin law, which the police are charged with upholding, expressly prohibits a landlord from entering the premises of a tenant who has not voluntarily abandoned the premises or who has not been removed by sheriff's execution of a judicial writ of restitution. If a landlord wants to retake possession from a defaulting tenant in a Wisconsin residential unit, "a small claims eviction action . . . is required."[9] The police officers knew that the landlord's attorney advised the landlord to begin a small claims action and that the landlord did exactly that in this case. Rather than wait for the eviction to run its course in 7 more days, the landlord sought police intervention. The police officers suspicions should have been aroused.[10]

---

[9]Kitzke, *Representing Residential Landlords in Wisconsin,* 55 Wis. Bar Bull. 22, 58 (Nov. 1982). See also Wisconsin State Bar (ATS-CLE), *Representing Residential Landlords and Tenants in Wisconsin,* in Residential Leases at 25 (1982); ch. 799, Stats. 1989–90.

[10]The landlord testified that he "explained the circumstances to [Officer] Adams" when he went to the police station. The inference is that the landlord told the police what he told the court at the suppression hearing about his dealings with the tenants, including his small claims eviction action pending against Bakeman. See testimony of landlord appended hereto.

I believe the Wisconsin law prohibiting a landlord from entering the premises of a holdover tenant creates a presumption that the landlord does not have authority to consent to an entry when the premises have been rented, the occupants claim rights as tenants, and a civil eviction action is pending. Nothing in the record, except the landlord's own statement, rebuts this presumption or supports the majority's finding that the officers had a reasonable belief that the landlord in this case had authority to permit the police to search the apartment.

The state has the burden of establishing the police officers' reasonable belief that the landlord had authority to consent to the search. On the basis of this record the only reasonable inference is that at the moment of entry the landlord's authority to consent was problematic at best. On the basis of this record it is clear that the state has not sustained its burden.

According to the landlord's testimony, the officers at the police station disagreed whether the landlord could consent to a search of the apartment. The captain refused to enter the premises upon the landlord's request. The landlord had to "shop" for an officer who would agree to enter the premises.[11]

This record contains significant evidence from which the police should have reasonably concluded that a tenant still claimed rights in the apartment and that the landlord may be attempting to evade the eviction

---

[11]The landlord had to speak to the police twice before he could convince them to search the apartment. According to the landlord's testimony at the suppression hearing, he talked first to the captain at the police station who told him "there is not a heck of alot you can do." The landlord left, and upon advice of a friend returned to speak to a different officer, Officer Adams. Officer Adams asked the landlord to sign a consent for them to search the apartment. See testimony of landlord appended hereto.

laws (upon which he was proceeding in civil court) by resorting to the police. In this case the facts available to the police when they entered the dwelling should have alerted reasonable police officers that further inquiry was necessary to determine whether the landlord had actual authority to consent to the entry.[12]

I am dismayed that the majority opinion apparently takes the position that as a matter of law police officers are reasonable in relying on the word of a landlord who claims the right to enter an apartment over the word of an occupant of a rental unit who claims the rights of a tenant. The majority opinion characterizes Bakeman's and the defendant's testimony as self-serving, majority op. at 975, n.4, but accepts the landlord's testimony as truth. Nothing in Wisconsin law or in my experience justifies a per se rule favoring the word of a property owner over the word of a nonproperty owner.

I conclude that because the landlord did not have authority to consent to the search and the officers could not have an objectively reasonable belief that the landlord had authority to consent to the search, the search of the apartment violated the fourth amendment and the evidence obtained from the search must be suppressed.

I also conclude that *Arizona v. Hicks,* 480 U.S. 321 (1987), governs this case. The officers here did not have probable cause to believe the stereo was stolen and therefore the separate search of the stereo violated the fourth amendment.

For the reasons set forth, I dissent.

---

[12]At a minimum this court should remand this case for the circuit court to determine whether the officers could have reasonably believed that the landlord had authority to consent to entry to the dwelling. The United States Supreme Court remanded the *Rodriguez* case for just such a determination. *Illinois v. Rodriguez,* — U.S. —, 110 S. Ct. 2793, 2801–02 (1990).

## Appendix

### Pertinent Parts of Landlord's Testimony at Suppression Hearing

*Direct Examination by Mr. Lenz*

Q. The downstairs portion of the duplex, had that been rented out in the fall of 1987?

A. [the landlord] Yes.

Q. And was that to a person by the name of Christine Whaley?

A. Yes, I did.

Q. What was the term of the lease?

A. I believe it was month-to-month.

Q. Do you have a copy of that lease?

A. Yes, I do.

Q. And where would that be?

A. At my office.

Q. You didn't bring a copy with you today?

A. No, I didn't. No.

Q. On, had you had any, experienced any problems in getting rent at this property?

A. From her?

Q. Yes.

A. Yes.

Q. And you had sent an eviction notice to her, is that correct?

A. That's correct.

Q. Or delivered?

1006

A. Yeah, I delivered one and then I also had one served, I believe.

Q. And the one served would have been the middle of the month?

A. I believe so.

Q. On or about December 20 you went to the residence there at 232 Sara Street, is that correct?

A. Yes.

Q. And you found James Bakeman and some others perhaps present at the lower unit of 232 Sara Street, is that right?

A. I don't remember the exact date, but I believe it was a Saturday and there were probably eight to 10 fellows there sitting around. It was about eleven o'clock in the morning.

Q. Okay.

. . .

Q. And Mr. Bakeman informed you that he was there with Whaley's permission?

A. I don't remember that being said. I, I can't really remember the conversation. It's been quite awhile.

Q. And you were upset to still find folks living there, is that right?

A. That's correct.

Q. And did Mr. Bakeman offer to make up and pay the rent?

A. Gee's, I can't remember this. He might have. I, but that was not acceptable.

Q. Okay, it was then that you filed for eviction action against Mr. Bakeman, is that right, after you had the conversation with him?

1007

A. I orally told him that I wanted him to get out of the apartment since I had not rented to him, and he said, "Well, I guess I'll see you in court." So then what I did, I contacted a friend of mine who is an attorney, and he said, "Well," and maybe I didn't explain the whole situation. He said, "Well, you have to go through the eviction process," so that's what I did.
. . . [exhibits marked]

Q. And the action is for eviction and it's dated the 21st day of December, 1987, is that correct?

A. That's correct.

Q. And the return date when Mr. Bakeman would be called to answer the question of whether he should be evicted was December 31, 1987, is that correct?

A. That's correct.
. . . [exhibits marked]

Q. Now, on or about, on, not or about, on December 24th, did you have any conversation with a Karen Johnson?

A. Yes, I did.

Q. And she's a manager for another landlord in town, is that right?

A. I believe so.

Q. And she called you and told you to contact the police about getting these folks out of here, out of that premises?

A. That's correct.

Q. And you subsequently called the police and talked to a Officer Donn Adams?

A. Well, can I tell the whole story or—

1008

Q. Sure.

A. Okay.

COURT: Well, he's leading you well enough, but go ahead. You might as well put it in your own words rather than Lenz' words.

A. All right, yeah. Well, I had, I assumed that those fellows were going to be out of the apartment. I thought they had already been gone, being the day before Christmas. Of course, we were getting ready to leave to go visit relatives. And I get a call like two o'clock, eight o'clock in the morning from Karen Johnson and she said, "Well, the boys wild again last night," something to that effect.

And being close to the holidays, of course, I was upset, so immediately I, I went down to the police station because I only live a block or two away. And I talked to, I believe, a captain at the police station, talked to him a little bit. And he said, "Well, there is not a heck of a lot you can do," you know, not really, I guess, not relaying the whole story to me, or him, not being versed in the law.

So I went back home and then Karen called me again, and we talked a little bit more, and she said, "Well, did you give permission to those people?" And I said, "No, I did not." I didn't even realize they were in the apartment. I thought I had taken care of that problem. And she said, "Well, you can probably have them evicted today because of trespassing." And that seemed very plausible to me, I mean, make sense to me because I did not give them permission to be in there.

1009

So then she said, "Call the police department," and she gave me the name. Yes, she gave me two names, and Donald Adams was one of them, and he's the fellow I, I, I talked to.

BY MR. LENZ [defense counsel]:

Q. And Mr. Adams requested you to come down to the police station?

A. Yes.

Q. And you came, you went down there?

A. You bet.

Q. And you basically explained the circumstances to Mr. Adams and any other folks that might have been present during that conversation?

A. That's correct.

Q. Do you remember who else was there when you explained the circumstances at the police station?

A. Well, there were a lot of police. I don't know.

Q. Okay, yes, in, and you were requested then to go to 232 Sara Street with the police?

A. Yes.

Q. And you went with them?

A. Yes, I did.

Q. And you signed a piece of paper which was a consent to search this premises?

A. I signed something. I can't remember exactly whether it was, I don't know whether it was to search it or to, yeah, I wanted, I wanted the fellows out of there because I did not give them permission to be in there. They had already done probably over a thousand dollars worth of dam-

1010

age to the place now, you know. I did nothing but lose money.

Q. It hasn't been a money-making property?

A. No, just like sitting there.

Q. You gave the police permission to search this residence, do you recall that? You don't really remember, okay.

A. I wanted them out of there, you know.

*Cross-examination by Assistant District Attorney Miller*

Q. Now, you had Christine Whaley evicted in the middle of November of 1987, is that right?

A. That's correct.

. . . [exhibits marked]

Q. And I'm going to show you what's been marked as Exhibit No. 3. can you identify that?

A. Yes, I believe he, I think I had two served on her. I think the one that I personally served, I just put it on her door, and she was not home at the time, and then there was another one.

Q. Okay, and this was dated November 18th of 1987?

A. Right.

. . . [exhibit marked]

Q. And then when you came down to the police station, you said you signed a piece of paper. I am going to ask, give you what is marked Exhibit 4 and ask you if that looks like your signature on that paper?

A. Okay.

Q. Does it?

1011

A. Yes.

Q. And what does this document purport to be?

A. Search.

Q. Does it indicate that it's consent to search?

A. Yes.

Q. And you signed that then on—

A. Yes, I did.

Q. —December 24th of 1987?

A. Right.

Q. At 10:12 a.m.?

A. Right.
 . . . [exhibit marked]

BY MS. MILLER:

Q. And now you indicated that you felt that Christine Whaley had vacated the premises?

A. Right.

Q. And what was the reason that you went to the premises in December and you found Hugh Bakeman, Jim Bakeman there?

A. Well, Karen Johnson, our friend down the block, had called and she had indicated that they had another loud party. The police were over there or whatever, I don't know, and I had, I had assumed that she was out of there, and I had just had not had time to get over there and get it ready to have it rented again. And then she called and also the fellow that lived upstairs all through this time, there was a guy living upstairs. He had also called me and said that there is somebody living down there. And so I went over there, and I believe it was a Saturday.

1012

I can't remember the exact date, and I believe it was in the morning, and that's when I found eight to 10 guys sitting around and verbally told them, "Now, I want you out of here," because I didn't ever consent to them being in there. And there, that was sometime in December. What date actually, I can't remember.

Q. Okay, so then the reason you went, went through the legal process of evicting Mr. Bakeman was through advice from your attorney?

A. Right.

MS. MILLER: That's all the questions I have.

## REDIRECT EXAMINATION

BY MR. LENZ:

Q. Now, you said that you, say that you gave a second eviction notice to Christine Whaley?

A. I believe so, yes.

Q. And that was left on the door or hand-delivered?

A. I hand-delivered one, and she was not there, so my counsel or attorney, or whatever, I had talked to somebody, and he said, "Well, if she's not there, put it on her door and that serves as," you know, having her served as a party, so I was just going by what he says.

Q. Okay.

MR. LENZ: I have no further questions.

COURT: Just one question. When you went over there that morning and saw these six or

1013

eight guys there, was Christine Whaley anyplace around?

A. No.