IN the INTEREST OF ISIAH B., A Child Under the Age of 18:

ISIAH B., Appellant,

v.

STATE of Wisconsin, Respondent.

Supreme Court

*No. 91–1939. Oral argument January 7, 1993.—Decided June 7, 1993.*

(Also reported in 500 N.W.2d 637.)

For the appellant there was a brief and oral argument by *Mark Lukoff*, assistant state public defender.

For the respondent the cause was argued by *Gregory M. Posner-Weber*, assistant attorney general, with whom on the brief was *James E. Doyle*, attorney general.

STEINMETZ, J. Isiah B. appeals contending that the random search of his school locker was unconstitutional under the Fourth Amendment to the United States Constitution and Article I, sec. 11 of the Wisconsin Constitution. At the time of the search, there was a significant risk of imminent, serious personal harm to students and staff. We conclude that under the circumstances present at Madison High School, Milwaukee, Wisconsin, on November 19, 1990, the random search of the locker was permissible under the United States and Wisconsin Constitutions. Accordingly, we affirm the judgment of the circuit court.

The problems at Madison High School began in the fall of 1990 when the school administration was confronted with a series of gun-involved complaints and/or incidents in and around the school. In total, between October 23, 1990, and November 17, 1990, the Madison High School administration investigated five or six incidents where guns were said to have been used or

were present on the school's premises. As a result of its investigations, the administration substantially verified the presence of guns (or in one instance a starter pistol) in two of those incidents. In addition, due to two incidents involving threats to the same student, the administration, at the urging of the student's parents, agreed to allow the student to transfer because of fear for his safety. As to these five or six incidents, the circuit court concluded that "[w]hile they were all cause for serious concern, . . . incidents appeared to be escalating in terms of the immediate threat of harm to students and staff at Madison High School."

On the weekend of November 16, 1990, the weekend before the search at issue, two incidents occurred which involved gunfire on school premises. First, on Friday night students reported that they were fired at as they left the school following a basketball game. Second, on Saturday night following a school dance a near riot occurred on school grounds when the departing students and security personnel for the school heard multiple gunshots. Large numbers of students were on the school grounds at the time. The presence of guns was confirmed, not only by the sounds of gunfire and the reaction of the crowd, but also by the recovery of spent casings on school grounds.

The circuit court found that on the following Monday morning, November 19, 1990, "an atmosphere of tension and fear dominated" Madison High School. The school staff and security personnel received reports of guns present in the school, gun sightings on school buses, and rumors that a shootout at the school on that date was, in effect, inevitable. As to these reports, the circuit court noted that "[t]he identities of those reporting such rumors/sightings were either genuinely unknown to witnesses or they feigned ignorance out of

apparent concern for the safety of those students." Despite announcements by Principal Willie Lee Jude regarding the administration's ongoing investigation into the incidents and the administration's efforts to address the situation, some staff members and students requested to leave the school out of fear for their safety. The efforts to resolve the atmosphere of fear in the school included staff meetings to gather the facts and identify students who might have information as to the perpetrators of the incident on Saturday and/or those who might have weapons in school on that morning. The circuit court found that the administration's efforts were met with little success.

Due to the heightened fear and tension and the significant risk of imminent, serious personal harm to students and staff, Principal Jude ordered school security personnel to begin a "random" search of student lockers as a preventative measure while he continued investigatory interviews. As to the randomness of the search, the circuit court noted that "[Principal Jude] did indicate that the search was not entirely random, however the testimony in that regard was extremely vague, warranting the conclusion that it was random." The circuit court also indicated that evidence was introduced, including a Milwaukee Public School Handbook, to indicate that "it is announced school policy that lockers are the property of the school system and subject to inspection as determined necessary or appropriate."[1] Students and parents are apprised of this policy. In addition, the school adminis-

---

[1] The policy stated as follows:

School lockers are the property of Milwaukee Public Schools. At no time does the Milwaukee school district relinquish its exclusive control of lockers provided for the convenience of students. Periodic general inspections of lockers may be conducted by school

tration has pass keys for the lockers, and students are prohibited from putting private locks on their lockers.

Nathan Shoate, a Madison High School security aide, conducted the individual locker searches at the direction of Principal Jude. Using the school's pass key, Shoate opened the lockers and visually inspected the locker interiors, moving articles to facilitate the observation. Shoate acknowledged that he also patted down coats or inspected personal articles during the course of the locker searches. Shoate conducted between 75–100 locker searches before he opened the locker that was later identified as Isiah B.'s. The school officials had no particularized or individualized suspicion that Isiah B.'s locker would contain evidence of law or school rule violations. Isiah B. did not have a history of prior weapon violations nor did the school officials suspect his involvement in the recent gun incidents.

At Isiah B.'s locker, Shoate opened the locker, removed a coat and immediately believed it to be unusually heavy. He then patted the exterior of the coat and felt a hard object, which he believed to be a gun, in an interior pocket. Shoate immediately notified the principal. Before the principal arrived, Shoate observed the handle of a gun in the coat by pulling open the pocket. The circuit court concluded that the coat was then brought to the principal's office where Isiah B. was confronted with it, whereupon he admitted that cocaine was also in the coat. Testimony in the trial transcript indicates that the cocaine was discovered prior to the time Isiah B. came to the office. Shoate testified that cocaine was discovered "[a]fter looking into the coat a little further in the principal's office." He indicated that cocaine was located underneath the gun

authorities for any reason at any time, without notice, without student consent, and without a search warrant.

in the pocket. Principal Jude testified that he knew that the cocaine was in the pocket before questioning Isiah stating: "I could see it. I could see it in the same pocket [as the gun]."

Subsequently, a delinquency petition was filed against Isiah B. alleging possession of a dangerous weapon on school property and possession of cocaine with intent to deliver. Isiah B. moved the circuit court for an order suppressing the gun and cocaine as products of an illegal search. The circuit court denied Isiah B.'s motion to suppress the evidence gathered in the search and adjudicated Isiah B. a delinquent child upon findings that he possessed a dangerous weapon on school premises, contrary to sec. 948.61(2), Stats., and that he possessed a controlled substance with intent to deliver, contrary to secs. 161.16(2)(b)1 and 161.41(1m)(c)1. We accepted the certification of this case from the court of appeals.

■

The Fourth Amendment to the United States Constitution and Article I, sec. 11 of the Wisconsin Constitution proscribe unreasonable searches and seizures.[2] In reviewing a circuit court's denial of a motion to suppress and its conclusion that a search was

---

[2] The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized.

Article I, sec. 11 of the Wisconsin Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable

reasonable, this court will uphold the circuit court's findings of historical or evidentiary fact unless they are against the great weight and clear preponderance of the evidence. *State v. Whitrock,* 161 Wis. 2d 960, 973, 468 N.W.2d 696 (1991); *see also State v. Turner,* 136 Wis. 2d 333, 343, 401 N.W.2d 827 (1987). "Therefore, disputes as to the factual circumstances surrounding the admission must be resolved in favor of the trial court." *State v. Clappes,* 136 Wis. 2d 222, 235, 401 N.W.2d 759 (1987). However, whether these facts satisfy the constitutional requirement of reasonableness is a question of constitutional fact which is independently reviewed by this court as a question of law. *Whitrock,* 161 Wis. 2d at 973. This court exercises independent appellate review of constitutional facts because " '[t]he scope of constitutional protections, representing the basic value commitments of our society, cannot vary from trial court to trial court, or from jury to jury.' " *State v. Woods,* 117 Wis. 2d 701, 715, 345 N.W.2d 457 (1984) (quoting *State v. Hoyt,* 21 Wis. 2d 284, 305–06, 128 N.W.2d 645 (1964) (Wilkie, J. concurring)).

In addition, "[t]his court has consistently and routinely conformed the law of search and seizure under the state constitution to that developed by the United States Supreme Court under the fourth amendment." *State v. Fry,* 131 Wis. 2d 153, 172, 388 N.W.2d 565 (1986). We choose to do so in this case.

Unlike many cases involving the constitutionality of a search, the search at issue in this case was not conducted by law enforcement officials. Rather, Madison High School officials conducted the search of Isiah B.'s locker. The law concerning the legality of

cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

searches conducted by public school officials was quite unsettled until 1985. In 1985, the United States Supreme Court decided *New Jersey v. T.L.O.,* 469 U.S. 325 (1985), a case addressing the proper standard for assessing the legality of searches conducted by public school officials. Although the opinion in *T.L.O* left some unanswered questions, it provides a framework of analysis for resolving this case.

At issue in *T.L.O.* was the constitutionality of a search of a student's purse. The search was conducted by a school principal after a teacher reported catching the student smoking in a school lavatory, and the student denied the allegation. The Court in *T.L.O.* began its analysis of the Fourth Amendment issue by addressing whether the Fourth Amendment's provisions apply to searches conducted by public school officials. The lower courts had been divided on this issue, with many concluding that school officials are exempt from the dictates of the Fourth Amendment by virtue of the special nature of their authority over children. *T.L.O.,* 469 U.S. at 336 (citing *e.g., R.C.M. v. State,* 660 S.W.2d 552 (Tex. App. 1983)). The Supreme Court rejected this argument concluding that:

> [s]uch reasoning is in tension with contemporary reality and the teachings of this Court. . . . In carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State, not merely as surrogates for the parents, and they cannot claim the parents' immunity from the strictures of the Fourth Amendment.

*Id.,* at 336–37.

Prior to the Supreme Court's pronouncement in *T.L.O.*, the court of appeals of this state similarly rejected this argument. *See Interest of L.L. v. Washington County Cir. Ct.,* 90 Wis. 2d 585, 597, 280 N.W.2d 343 (Ct. App. 1979). We are bound by the Supreme Court's conclusion that public school officials are state agents for purposes of Fourth Amendment search and seizure analysis and as such must conform their conduct to the strictures of that amendment. Thus, applying the dictates of the Fourth Amendment, the question in this case is whether the search of Isiah B.'s locker was one done subject to the Fourth Amendment.

As to determining the reasonableness of a search, the Supreme Court in *T.L.O.* stated:

> [w]hat is reasonable depends on the context within which a search takes place. The determination of the standard of reasonableness governing any specific class of searches requires 'balancing the need to search against the invasion which the search entails.' On one side of the balance are arrayed the individual's legitimate expectations of privacy and personal security; on the other, the government's need for effective methods to deal with breaches of public order.

*Id.,* at 337 (citations omitted).

Recognizing that before a balancing of interests can take place a court must first conclude that a reasonable expectation of privacy exists on the student's side of the balance, the Supreme Court concluded that a student has a legitimate reasonable expectation of privacy in a purse. *Id.* at 337–38. However, the court specifically declined to express any opinion on whether a student has a legitimate reasonable expectation of privacy in a

648

school locker. *See Id.* at 337 n.5. The state of Wisconsin urges this court to conclude that Isiah B. had no reasonable expectation of privacy in his locker and thus no search for Fourth Amendment purposes took place.

■ We agree with the state and hold that when the Milwaukee Public School System (M.P.S.), as here, has a written policy retaining ownership and possessory control of school lockers (hereinafter referred to as a locker policy), and notice of the locker policy is given to students, then students have no reasonable expectation of privacy in those lockers. Consequently, the circuit court properly denied his motion to suppress.

If school authorities do not have a locker policy like the one in this case, students might have a lowered reasonable expectation of privacy in their lockers. With respect to a public school student's reasonable expectation of privacy, the Supreme Court stated the following in *T.L.O.:*

> To receive the protection of the Fourth Amendment, an expectation of privacy must be one that society is 'prepared to recognize as legitimate.' *Hudson v. Palmer, supra,* at 526, . . . .
>
> Although this Court may take notice of the difficulty of maintaining discipline in the public schools today, the situation is not so dire that students in the schools may claim no legitimate expectations of privacy.

*Id.* at 338.

> [S]choolchildren may find it necessary to carry with them a variety of legitimate, noncontraband items, and there is no reason to conclude that they have necessarily waived all rights to privacy in such items merely by bringing them onto school grounds.

*Id.* at 339. School administrations may adopt a locker policy retaining ownership and possessory control of school lockers and give notice of that policy to students.

Because Isiah B. had no reasonable expectation privacy in his locker, there was no Fourth Amendment violation, and the circuit court properly denied Isiah B.'s motion to suppress. We affirm the judgment of the circuit court.[3]

" 'We must never forget, that it is *a constitution* we are expounding,' 'a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs.' " *Hirabayashi v. United States,* 320 U.S. 81, 100–01, (1943) (citing *McCulloch v. Maryland,* 4 Wheat. 316, 407, 415, (1819)); *see also Euclid v. Ambler Co.,* 272 U.S. 365, 386–87 (1926); *Missouri v. Holland,* 252 U.S. 416, 433 (1920); *Weems v. United States,* 217 U.S. 349, 373 (1910). Our holding is an example of adaptation of constitutional principles to a modern crisis. As noted by the Supreme Court in *T.L.O.,* the presence of dangerous weapons in schools is a recent and extremely serious problem. On February 12, 1993, a Milwaukee Sentinel article indicated that 37% of male, Wisconsin high school students carry weapons. The article also

---

[3] Isiah B. argues that a valid Fourth Amendment search of a student's locker by public school officials requires said officials to promulgate and conform to written guidelines governing locker searches. Isiah B. also argues that public school officials must possess an individualized suspicion that a student's locker contains evidence of a crime or school rule violation before said locker can be searched in accord with the Fourth Amendment. Because we conclude that Isiah B. did not have a reasonable expectation of privacy in his locker, we do not reach these issues.

indicated that "35% of the weapons . . . carried were guns, 49% knives or razors, [and] 16% clubs, bats[,] . . . pipes or other weapons."

*By the Court.*—The judgment of the Milwaukee county circuit court is affirmed.

SHIRLEY S. ABRAHAMSON, J. *(concurring and dissenting).* Safety in the schools is a matter of utmost concern and growing urgency. The facts of this case illustrate the very real dangers to which modern-day students are exposed and the serious obstacles school officials confront in keeping school environments safe and conducive to learning. Because the threat of imminent violence presented an exigent circumstance in this case, I conclude that a reasonably conducted search of lockers would not have violated the fourth amendment.

I am not persuaded by this record, however, that the search was conducted in a reasonable manner. I would therefore remand the cause to the circuit court for further findings on the manner in which the search was conducted.

Finally, I disagree with the majority's conclusion that the Milwaukee School District's policy of reserving the right to search lockers made unreasonable any expectation of privacy the students possessed in the contents of their lockers. Students, like other members of our society, possess a fourth amendment right to be free from unreasonable searches. *New Jersey v. T.L.O.,* 469 U.S. 325, 333 (1984). In *T.L.O.* the United States Supreme Court concluded that the school setting requires some easing of the restrictions to which searches by public authorities are ordinarily subject. *T.L.O.,* 469 U.S. at 340. This easing of restrictions does

not, however, completely eliminate a student's protection against unreasonable searches. I agree with the circuit court's conclusion that students have "a valid, though limited, expectation of privacy as to the contents of lockers they are assigned . . . regardless of the school policy suggesting a right to randomly inspect." (R.31:13)[1]

## I.

The United States Supreme Court has declared to date that either probable cause or individualized suspicion must exist to justify a warrantless search in a school setting.[2] Neither individualized suspicion of the

---

[1] A law review commentator concludes that "every post-T.L.O. court that has confronted this issue [of locker searches] has concluded that the T.L.O. decision to permit warrantless searches based only on reasonable suspicion is appropriate in locker-search cases as well. In so concluding, these courts consistently have found that a student maintains some reasonable expectation of privacy in her locker." Berman, *Student Fourth Amendment Rights: Defining the Scope of the T.L.O. School-Search Exception,* 66 N.Y.U. L. Rev. 1077, 1103–04 (1991). *See, e.g., In Interest of Dumas,* 515 A.2d 984, 986 (Pa. Super. 1986); *State v. Michael G.,* 748 P.2d 17, 19 (N.M. Ct. App. 1987); *Commonwealth v. Snyder,* 597 N.E.2d 1363, 1366 (Mass. 1992); *S.C. v. State,* 583 So. 2d 188, 191–92 (Miss. 1991).

As a Pennsylvania court stated: "We are unable to conclude that a student would have an expectation of privacy in a purse or jacket which the student takes to school but would lose that expectation of privacy merely by placing the purse or jacket in [the] school locker provided to the student for storage of personal items." *In Interest of Dumas,* 357 Pa. Super. 294, 515 A.2d 984, 985 (1986).

[2] To determine the reasonableness of a search, a two-fold inquiry is required: Was the search justified at its inception *(e.g.,* probable cause; individualized suspicion)? Was the search

652

defendant nor probable cause to search the defendant's locker existed in this case.

The search in this case was, however, conducted in response to the threat of imminent violence in the school. The situation confronting Madison High School on November 19, 1990, was grave. There was evidence that guns had been fired on school property during the preceding weekend. Students, faculty and parents apparently believed that weapons were being brought into the school, that a shootout was imminent, and that the school was unsafe. The threat of imminent violence was disrupting school attendance and the educational process. Thus, the search in this case was conducted in response to an identified, specific danger which could not be dealt with by following the traditional probable cause or reasonable suspicion standards.

I conclude that this threat of imminent violence constituted an exigent circumstance. I further conclude that it would be unrealistic and inimical to the school's goal of preventing imminent violence in this case to require a showing of individualized suspicion or probable cause. *See Camara v. Municipal Court,* 387 U.S. 523, 536–37 (1966) (reasonableness of administrative search is determined by balancing the need to search against the invasion the search entails).

## II.

Even if a search is constitutional in its inception, it will not pass muster under the Fourth Amendment unless it is conducted in a reasonable manner. A search conducted under exigent circumstances must be con-

as conducted reasonably related in scope to the circumstances which justified the interference in the first place? *T.L.O.,* 469 U.S. at 341.

ducted in a manner reasonably related in scope to the exigent circumstances which justified the interference. *T.L.O.*, 469 U.S. at 341; *Terry v. Ohio*, 392 U.S. 1, 20–21 (1968). Thus, the search of school lockers in this case must be tailored to the public interest which compelled the search.

In this case, the search was for the purpose of finding weapons to prevent imminent violence and to ensure school safety. Accordingly, while the exigent circumstances present in this case may have authorized school officials to search lockers for weapons, these exigent circumstances would not justify use of a search to punish or harass disfavored students or to look for evidence unrelated to the exigency.

The record indicates that the school officials' search may not have been reasonably related in scope to the circumstances which justified the interference. When asked the purpose of the search, the searcher said: "To uncover anything unusual."[3] The circuit court made no finding about the relationship of the scope of the search to the exigency which compelled it.

Furthermore, when exigent circumstances preclude insistence on probable cause or individualized suspicion, the search must be conducted in a manner that "safeguard[s] the privacy and security of individuals against arbitrary invasions. . . ." *Delaware v. Prouse,* 440 U.S. 648, 654 (1978); see also *T.L.O.,* 469

[3] The full questioning was as follows:

Q. What was the purpose of this particular search?

A. To uncover anything unusual. There was reports that weapons were in the school so we were looking for anything unusual.

Q. Anything unusual. That might mean not necessarily guns specifically?

A. Yeah. Well, anything whenever we're searching lockers we're looking for something that doesn't belong in the school.

654

U.S. at 342 n.8. The search should be conducted so that "the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.' " *Delaware v. Prouse*, 440 U.S. 648, 655 (1978); see also *Camara v. Municipal Court*, 387 U.S. 523, 532 (1967).[4] A random search can achieve these goals. The dictionary definition of random is without a plan or pattern. Random sampling is a statistical technique which ensures that any member of a population has an equal chance of inclusion in a sample for study.[5] Because a

[4] *See Prouse*, 440 U.S. at 662 (search unaccompanied by individualized suspicion must be undertaken according to "previously specified 'neutral criteria.' "); *Michigan State Police v. Sitz*, 496 U.S. 444, 453 (1990) (linking constitutionality of sobriety checkpoint stop to use of standardized procedures which eliminated police discretion); *Marshall v. Barlow's*, 436 U.S. 307, 320–21 (1977) (linking constitutionality of workplace safety searches to use of neutral, administrative procedures in selecting sites to be searched).

Defense counsel argues that the school officials' discretion should be circumscribed by written guidelines. I conclude that the search should be conducted according to procedures, preferably in writing, which safeguard against arbitrary or harassing searches. I do not conclude that searches are constitutional only when the procedures are in writing.

[5] A random locker search could be conducted by placing all the locker numbers in a hat and drawing out a pre-determined quantity. Only those lockers corresponding to the numbers drawn would then be searched. It would also be possible to quickly obtain a random sample of locker numbers to search by using a random number table, or by using computer capabilities already in place in many school systems.

Although not a random search, a search of every second, third or tenth locker would have been a search according to neutral criteria. In fact, considering the dangers presented, officials might have searched every locker. That, however, is not what they did.

random search is non-accusatory in nature, the degree of insult to an individual's dignity and thus the extent of the invasion are reduced.

The circuit court found that the search in this case was conducted at random. The circuit court found the search to be random even though it conceded that the Madison High School principal "did indicate that the search was not entirely random" and that "the testimony in the record was extremely vague. . . ." (Majority op. at 643). I read the record as contradicting the circuit court's finding that the search was random.[6]

School safety officer Nathan Shoate testified that he searched lockers "randomly." However, when asked to explain what "randomly" meant in this case he stated:

> A. At that time we immediately randomly searched lockers. We didn't—We wanted to—We started on the lower level checking lockers where we knew there was a crowd.
>
> Q. When you say randomly searched lockers, how did you pick a locker to search?
>
> A. Basically we can tell where the kids' lockers, where the problem students would be at, you know, problem students' lockers. And we went to that locker. It's—we checked lockers where most of the crowds were formed. But there is five to six people at one locker we'll make sure that we get to that locker to check. R.19:38.[7]

---

[6] "Findings of fact shall not be set aside unless clearly erroneous. . . ." Section 805.17(2), Stats. 1991–92.

[7] The dialogue continues as follows:

> Q. In the process of searching how many lockers were searched to your knowledge, estimating?
>
> A. 70, 75, 100 maybe; I don't know.
>
> Q. Do you have any idea how many lockers there are in the school?

Thus the record shows that school officials selected at least some of the lockers they would search; they selected lockers where students congregated and lockers used by so-called "problem students." This was clearly not a random search.

The record is silent on how the school officials determined that a search of these selected lockers was reasonably related to the exigency which compelled the search. The school official did not explain, for example, the connection between lockers where crowds gathered and the exigent circumstances justifying the search. Nor does the record explain what is meant by a "problem student." That description may have been based on the student's class attendance, dress, mode of speaking, grade point average or any number of factors unrelated to the possession of weapons.

I would remand the case to the circuit court for further inquiry into whether the search was reasonably tailored to the circumstances which compelled it and whether the search was conducted in a manner that safeguarded the privacy of students against arbitrary invasions.

A. No, I don't.

. . .

Q. Why did you search his [Isiah B.'s] locker?

A. It wasn't his locker. It was a random check. Isiah's locker was—it could have been missed. It—If it was just—I just checked his locker.

Q. Did you know it was Isiah's locker when you opened it?

A. No I didn't.

Q. Did you know it was a locker of somebody suspicious or did you have any suggestions that anything suspicious was in that locker?

A. Like I say it was a random check. It was a random check so I just went to the locker and ———. R. 19:38–42.

## III.

The majority concludes that Isiah's fourth amendment rights were not violated because he had no reasonable expectation of privacy in his locker. The majority bases this conclusion on the school district policy reserving the right to conduct a general search of student lockers. I disagree with this conclusion.

The right to be free from unreasonable searches is constitutional in nature and dimension. While notice that a locker may be searched might diminish the reasonableness of a student's expectation that items stored there will be kept secret, numerous courts have repeatedly stated that a government proclamation cannot eradicate Fourth Amendment rights. "The government could not avoid the restrictions of the Fourth Amendment by notifying the public that all telephone lines would be tapped, or that all homes would be searched."[8] The school's ownership or partial control of the lockers cannot negate the students' expectation of privacy in the contents of the lockers. As the United States Supreme Court explained in *Katz v. United States,* 389 U.S. 347, 351–52 (1967), "[w]hat a person seeks to preserve as private, even in an area

---

[8] *United States v. Davis,* 482 F.2d 893, 905 (9th Cir. 1973). *See also Jeffers v. Heavrin,* 701 F. Supp. 1316, 1321 (W.D. Ky. 1988) ("mere knowledge that one may be subject to search does not render one without any reasonable expectation of privacy"); *Jones v. Latexco Ind. School District,* 499 F. Supp. 223, 234 (E.D. Tex. 1980) ("mere announcement by officials that individual rights are about to be infringed upon cannot justify the subsequent infringement. . . ."); *Chenkin v. Bellvue Hosp. Cntr.,* 479 F. Supp. 207, 213 (S.D.N.Y. 1979) (plaintiff's expectation of privacy in his bag was not rendered unreasonable by his employer's announced policy of searching employees' bags).

accessible to the public, may be constitutionally protected."

Finally, it appears that the search as conducted violated the school policy about locker searches upon which the majority relies. The school policy states that "[p]eriodic *general* inspections of lockers may be conducted by school authorities for any reason at any time. . . ." (emphasis added). General means applicable to the whole, rather than to a limited part. The search in this case was not a *general* search; the searcher intentionally selected and searched some lockers using non-neutral criteria.

## IV.

The majority justifies its abnegation of students' rights by claiming that the situation in the schools has taken on the dimensions of a crisis. This crisis, the majority appears to believe, requires us to modify our constitutional standards. We must never forget, the majority urges, "that it is a *constitution* we are expounding," "a constitution intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs." *Hirabayshi v. United States,* 320 U.S. 81, 100–01 (1942) (emphasis in original).

The *Hirabayshi* case illustrates the weakness of the majority's position. For me, the *Hirabayshi* case is a lesson in what can happen if we do not abide by our constitutional principles when adapting the constitution to crises. The *Hirabayshi* Court upheld the conviction of an individual charged with violating curfews imposed under authority of Executive Order No. 9066, requiring all persons of Japanese ancestry to be "within their places of residence between the hours of 8 p.m. and 6 a.m." In a concurrence, Justice Murphy

wrote that this was the first time the Court had "sustained a substantial restriction of the personal liberty of citizens of the United States based upon the accident of race or ancestry." 320 U.S. at 111 (Murphy, J., concurring). It was not the last. The Court cited *Hirabayshi* two years later in *Korematsu v. United States,* 323 U.S. 214 (1944), upholding regulations adopted pursuant to Executive Order No. 9066 which required citizens of Japanese ancestry to be relocated in camps.

I agree with Justice Scalia who wrote that the Constitution "is meant to protect against, rather than conform to, current 'widespread belief.' " *Maryland v. Craig,* 497 U.S. 836, 861 (1989) (Scalia, J. dissenting). A court's function is to safeguard our constitutional principles and, at the same time, to ensure that the judicial system is sensitive to the needs of crime victims and to society's need to protect individuals from crime and the fear of crime.

For the reasons set forth, I would remand the cause to the circuit court for further factfinding.

I am authorized to state that Chief Justice NATHAN S. HEFFERNAN joins this opinion.

WILLIAM A. BABLITCH, J. *(concurring).* I join the mandate in this case, and I agree with the majority's conclusion that Isiah B. had no Fourth Amendment privacy interests in his school locker. However, I reach that conclusion based on a different rationale than that expressed by the majority. The majority concludes that because the school has a written policy retaining ownership and possessory control of school lockers and gives notice of that policy, student's have no reasonable expectation of privacy in

those lockers. *Isiah B. v. State,* majority op. at 648–649. I do not agree that the school policy plays such a pivotal role in this case. I conclude that a student cannot claim a Fourth Amendment privacy interest in his or her school locker because that expectation is not an expectation that society will recognize as reasonable at this time. Thus, the school policy in this case does not negate an otherwise legally cognizable privacy interest, but rather merely informs students of the already existing legal fact; students do not have privacy interests in their school lockers.

I.

The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois,* 439 U.S. 128, 143 (1978). A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as "reasonable." *New Jersey v. T.L.O.,* 469 U.S. 325, 339 (1985).

In *T.L.O.,* the United States Supreme Court concluded that a student's privacy interest in a purse is an interest which society is willing to accept as reasonable. However, the court noted that it was not addressing the Fourth Amendment question with respect to school lockers. Furthermore, the Court intimated the potential for changing views concerning the interests in the school setting which society will recognize as reasonable. In particular, the Court emphasized the difficulty of maintaining discipline in public schools and analogized the school setting with that of prisons; a place where the Court has concluded that the need to maintain order mandates that prisoners retain no legitimate privacy interests in their cells.

The Court concluded, however, that it was not *"yet ready to hold that the schools and the prisons need be equated for purposes of the Fourth Amendment."* *T.L.O.,* 469 U.S. at 339 (emphasis added).

Although I do not think that public schools and prisons necessarily need be equated and thereby strip students of all privacy interests, I do think that the problems in public schools that have been on the rise since the *T.L.O.* decision, particularly the real and pervasive safety problems, warrant a conclusion that society is not willing, at this time, to recognize students' privacy interests in school lockers as reasonable.

The problems in our public schools have turned deadly, and students, teachers and administrators have real and justifiable fears concerning their schools. William Celis 3d, *School Crime Hits Suburbs and Small Towns,* N.Y. Times, April 21, 1993, at A1, B8. "School children are inflicting violent harms upon each other at an alarming rate." Donald L. Beci, *School Violence: Protecting Our Children and the Fourth Amendment,* 41 Cath. U.L. Rev. 817, 820 (1992) (citing Lisa D. Bastian & Bruce M. Taylor, U.S. Dep't of Justice, *School Crime: A National Crime Victimization Survey Report* (NCJ–131645) (1991)) (footnote omitted). According to a recent study conducted by the Center for Disease Control, one in five American high school students—and almost one in three boys—carries a gun, knife, or other weapon with the intent to use it if necessary. Glenn Ruffenach, *At High Schools One in Five Students Carries a Weapon,* Wall Street Journal, Oct. 11, 1991, at Section A, Page 5C column 2. In a recent national survey of school crime conducted over a six-month period, approximately one-half million American children reported experiencing one or more violent crimes while at school. Beci, *supra,* at 820 (cita-

tions omitted). "Twenty-two percent of all children feared an attack at school, and almost one-half million of them reported taking a weapon to school to protect themselves. *Id.* (footnote omitted).

One need only pick up a newspaper or magazine to realize that the situation in public schools continues to worsen. *See, e.g.,* The Atlanta Journal and Constitution, April 13, 1993, Section A, Page 8, *Guns at School: A New Reality, Weapons; Schools; Policy; Law; Reform;* Henry Chu, *Officials Try To Ease Parents', Students' Fears After Shooting; Violence: A Crowd at Reseda High is Assured that Steps to Increase Security are Being Taken. But Many Worried Adults Still Have Questions,* Los Angeles Times, February 26, 1993, Friday, Valley Edition, Metro; Part B; Page 3; Column 5; Marie Koklanaris, *'Blackboard Jungle' with More Firepower; Educators Seek Solutions to Violence,* The Washington Times, February 22, 1993, Monday, Final Edition, Part A; Pg. 1A; Charlie Weaver, *When Kids Pack a Gun Instead of Lunch,* Star Tribune, February 10, 1993 Metro Edition, News; Pg. 17A; Jordana Hart, *Schools Finding More Weapons; Steps Taken to Counter Aggression by Students,* The Boston Globe, May 10 1992, Sunday, City Edition, South Weekly; Pg. 1. Last year, researchers at Xavier University in Cincinnati interviewed administrators in 1,261 school systems finding that:

> Fifty-four percent of the 294 suburban school officials said violence in their schools had got worse in the past four years; 43 percent of the 344 small-town officials said violence was up, and 34 percent of the 413 rural officials said the same. (By comparison, 64 percent of the 210 urban school administrators said the problem was getting worse.) . . .

663

. . .
And with the proliferation of gangs, guns and knives, behavior that was once merely nasty has turned life-threatening. Celis, *supra,* at B8.

As these facts and the facts of this case exemplify, school administrators are desperately trying to protect the interests of all of their students from the growing problems in schools by trying to maintain safety without disrupting the learning environment of the school. With such immense problems occurring in the schools, with weapons of all kinds present daily, society is unwilling to view a student's alleged privacy interest in a locker as reasonable. Students should expect, and I would guess many often do expect and maybe even embrace, the fact that subjective expectations of privacy in their school lockers will not be viewed as reasonable by society, and that school officials may have to search lockers to ensure the safety of all of the students, staff, and other personnel at the school. Schools often have ready access to lockers either by a master key or lists of combinations. In some schools, administrators have attempted to resolve the problem by simply removing the school lockers, which are the school's property to remove. Laurel Walters, *School Violence Enters Suburbs,* The Christian Science Monitor, National Section, p. 6, April 19, 1993. Schools can search lockers without interfering with a student's person, thus avoiding interference with students' time in class. Furthermore, other than the person, the locker is the most likely place for storage of guns and other dangerous items. In light of the dangerous times and pervasiveness of weapons in the schools, students simply cannot reasonably expect that lockers, which the schools provide and maintain access to, will not be subject to search.

## II.

The majority concludes that Isiah B. has no constitutional expectation of privacy in his school locker because the school notifies students that lockers are subject to searches. Saying that a privacy interest is negated because students and parents were notified that lockers are Milwaukee Public School property and subject to inspection when necessary and appropriate reflects a very erroneous and very dangerous view of the Fourth Amendment. Negating a constitutional "expectation" of privacy based upon whether or not a person was notified of the impending search sets a dangerous precedent for intrusions upon Fourth Amendment rights.

According to the majority opinion, Madison High School's policy which notifies students that lockers are the property of the school, and that lockers can be inspected by the school at any time, negates any privacy interest a student might have had. I do not agree with this analysis because it does not rationally reflect the purposes of the Fourth Amendment. What the majority is saying is that the simple fact of informing someone that he or she might be searched *ipso facto* acts to negate that person's Fourth Amendment rights. That is an untenable constitutional principle. If the Madison police chief warns all Madison citizens that all cars found in the Dane County ramp on a certain date will be searched, that warning should in no way negate the constitutional privacy interests of the people who park their cars in the ramp on that date. Warning them in advance that their cars will be searched unquestionably reduces their "expectations" of privacy in a literal sense, but certainly does not negate their "right" of privacy under the Fourth Amendment.

The majority falls prey to what I perceive to be an increasing misunderstanding of the constitutional term "expectation of privacy." The majority errs by interpreting the word "expectation" literally. It has always been used in a constitutional sense to indicate reasonable privacy interests. Unfortunately, the majority's literal interpretation now says, in essence, that if you have been warned of an impending search, your privacy interests under the Fourth Amendment are negated because your expectations of privacy have been negated.

Perhaps the lesson here is that all courts should begin to look at these cases in terms of privacy "interests" rather than expectations. As I stated in my dissent in *State v. Rewolinski,* 159 Wis. 2d 1, 50–51, 464 N.W.2d 401 (citation omitted):

> When considering what is a 'reasonable expectation of privacy,' courts should focus on privacy interests rather than on privacy expectations in order to rationally reflect the purposes of the fourth amendment.
>
> Focusing on expectations leaves open the opportunity for the 'government by edict or by known systematic practice to condition the expectations of the populace in such a way that no one would have any real hope of privacy.'

A person's legitimate expectation of privacy cannot be deprived merely by notifying him or her that the expectation will not be honored. *See Jones v. Latexo Independent School Dist.,* 499 F. Supp. 223, 234 (1980) ("the mere announcement by officials that individual rights are about to be infringed upon cannot justify the subsequent infringement. . . . through the medium of comparison, if the Government announced that all tele-

phone lines would henceforth be tapped, it is apparent that, nevertheless, the public would not lose its expectation of privacy in using the telephone."). Such a result, as one commentator succinctly explains, would render the Fourth Amendment for all practical purposes a nullity:

> Plainly, fourth amendment rights would be rendered meaningless if they were subject to serious qualification or elimination by the terms of regulations issued by those interested in making or facilitating a search. In fact, it seems safe to assume that the existence of a regulation is seriously treated as relevant at all only because the fourth amendment protects a 'reasonable expectation of privacy.' The false turn that seems to be signaled by this test can be uncovered by a simple hypothetical illustration. Suppose a police chief issues a 'regulation'—clearly written and widely circulated—stating that all houses in a particular area will be searched if the police chief finds it desirable to do so. It hardly seems likely that the courts would uphold the search, even though, if the chief is credible, the owner of the searched house may well not have had a reasonable expectation of privacy from that search. William G. Buss, *The Fourth Amendment and Searches of Students in Public Schools,* 59 Iowa L. Rev. 739, 763 (1974).

It seems so fundamental as to need no explanation that the "fourth amendment's protections cannot be defined in terms of merely factual expectations but must be shaped by the privacy that an individual ought to be entitled to expect." *Id.* The mere existence of a policy which indicates that the State may conduct a search does not necessarily negate nor lessen an individual's legitimate privacy interest.

In conclusion, I concur with the mandate but would hold that students have no privacy interests in their school lockers regardless of the presence or absence of a school policy which notifies student's of this fact.